HMG/COURTLAND PROPERTIES,
INC., Plaintiff,

v.

Lee GRAY, individually and as a general partner in Martine Avenue Associates, Norman A. Fieber, individually and as a general partner in NAF Associates, Betsy Gray Saffell, individually and as a general partner in Martine Avenue Associates, NAF Associates, and the Jim Fieber Trust, Defendants.

Civ. A. No. 15789.

Court of Chancery of Delaware,
New Castle County.

Submitted: June 25, 1999.
Decided: July 12, 1999.

William D. Johnston, James P. Hughes, Jr., of Young Conaway Stargatt & Taylor, Wilmington; Rolin P. Bissell, Aileen Camacho, of Schnader Harrison Segal & Lewis, Philadelphia, PA, for Plaintiff, of counsel.

Francis J. Trzuskowski, of Trzuskowski, Kipp, Kelleher & Pearce, Wilmington; Frank J. Silvestri, Jr., Marcy Tench Stovall, of Zeldes Needle & Cooper, Bridgeport, CT, for Defendant Norman A. Fieber, of counsel.

Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington; Paul S. Berger, of Fowler, White, Burnett, Hurley, Banick & Strickroot, Miami, FL, for Defendants Lee Gray and Betsy Gray Saffell, of counsel.

## OPINION

STRINE, Vice Chancellor.

This case involves thirteen year old real estate sales transactions between HMG/Courtland Properties, Inc. as seller and two of HMG's directors, Lee Gray and Norman Fieber as buyers. While Fieber's self-interest in the transactions was properly disclosed, neither he nor Gray informed their fellow directors that Gray— who took the lead in negotiating the sales for HMG—had a buy-side interest. Gray's interest was concealed from HMG for a decade and was only discovered inadvertently by the company in 1996.

In this post-trial opinion, I find that Fieber and Gray breached their fiduciary duties of loyalty and care and defrauded the company. I award relief to HMG de-

signed to remedy the harm caused by their misconduct.

## I. The Facts

### A. Parties and Key Players

Plaintiff HMG/Courtland Properties, Inc. ("HMG") is a Delaware corporation whose principal place of business is in Dade County, Florida. HMG is a publicly held real estate investment trust ("REIT") that invests in commercial real estate.

Since 1983, Maurice Wiener has served as HMG's Chairman of the Board and Chief Executive Officer ("CEO"). Wiener also holds a major equity position in HMG, both directly and through his ownership of a major portion of Transco Realty Trust, which in turn is HMG's largest shareholder. At all relevant times, Wiener was also Chairman, CEO, and a 40% shareholder in Courtland Group, Inc. (the "Adviser"), which served as HMG's investment adviser from 1972 through 1997.

Defendant Lee Gray was at all relevant times a director, President, and Treasurer of HMG. He also served as a member of the HMG Board's Audit and Executive Committees. Like Wiener, Gray had a significant equity interest in HMG, through his direct ownership of shares in HMG and through his 40% interest in Transco. Gray also served as President, Treasurer, director, and a 40% shareholder in the Adviser.

Defendant Norman A. Fieber ("Fieber") was a director of HMG and a member of HMG's Audit Committee from 1985 until 1997. Fieber is a builder and real estate developer in southwestern Connecticut. In 1984 or 1985, Fieber's son James A. Fieber ("Jim Fieber") left the private practice of law at the firm of Kelly, Drye & Warren to join his father's development business.

Defendant Betsy Gray Saffell ("Saffell") is Lee Gray's sister. Along with Lee Gray, Saffell was from 1984 to 1986 one of two general partners in Martine Avenue Associates ("Martine"), a general partnership. On December 31, 1996, Martine was dissolved.

### B. The Role of HMG's Adviser

Like many REITs, HMG relies heavily upon its investment adviser. HMG has no employees of its own, and the Adviser operates as the management of HMG, subject to the oversight and control of HMG's Board of Directors. All recommendations regarding HMG's real estate investments flow through the Adviser and are presented by the Adviser to the HMG Board. For its services, the Adviser receives compensation pursuant to a contract approved annually by HMG's independent (i.e., non-Adviser affiliated) directors.

During the period relevant to this litigation, Wiener and Gray were the key decision-makers at the Adviser. Although Wiener was the CEO of HMG and the Adviser and Gray was the President of each, Wiener and Gray operated less as superior and subordinate, and more as the long-standing colleagues and friends they were.[1] Each contributed complementary skills and personal styles to the ventures, with Wiener applying himself more constantly to HMG and the Adviser than Gray, since Gray had several other business ventures. Both, however, were committed full-time to the Adviser and HMG and received remuneration commensurate with full-time responsibilities.

This co-equal relationship was reflected in the decision-making process used by the Adviser, which was one of consensus. Although Wiener and Gray are both men of strong views, they apparently worked together quite effectively and always reconciled their differences before making recommendations to HMG on behalf of the Adviser. In 1983, Wiener and Gray brought Larry I. Rothstein on board as HMG's and the Adviser's Senior Vice President, Secretary, and Chief Financial Officer.

---

1. Wiener's and Gray's close personal relationship dates back to the late 1960s.

After Rothstein arrived, he functioned as part of a triumvirate that made decisions on behalf of the Adviser. Given his more recent arrival, the long-standing relationship between Wiener and Gray, and the substantial economic interests Wiener and Gray had in HMG and the Adviser, Rothstein occupied a less influential position than Gray and Wiener. Rothstein viewed Wiener and Gray, quite appropriately, as his superiors. Nonetheless, during the period relevant to this case, Rothstein was an important officer and decision-maker at the Adviser.

### C. HMG Considers A Major Transaction Involving The Grossman's Portfolio

In 1980, HMG and Transco invested in 38 retail/industrial parcels (the "Grossman's Portfolio" or the "Portfolio"), located in the Northeastern United States and leased by Grossman's, Inc. ("Grossman's"), which operated a chain of home-improvement stores. Through a joint venture called South Bayshore Associates ("SBA"), HMG and Transco owned 100% of the Grossman's Portfolio, with HMG owning 75% and Transco owning 25%.

During 1984 and 1985, Wiener and Gray began to give serious consideration to undertaking a major transaction to generate additional return from the Grossman's Portfolio, which by then had been downsized to 34 properties. As part of their consideration of how to maximize value from the Grossman's Portfolio, SBA commissioned appraisals of the Portfolio in 1984 (the "1984 Appraisals" or "Appraisals"). The Appraisals were intended to help Wiener and Gray determine whether it made sense to sell interests in the Grossman's Portfolio through a syndication, to refinance the Portfolio, or to sell the Portfolio. Tr. 772–773, 1218.

Two factors impelled Wiener and Gray to consider these options. First, it appears that HMG's 40% stockholder Transco, and perhaps HMG itself, faced some cash flow difficulties in 1984 and 1985. Tr. 894–895; DX 133. The precise extent of those difficulties is not clear from the record and I have no basis to believe that those difficulties were of great urgency. Tr. 781, 1378. However, those difficulties did lead Wiener and Gray to consider options to increase cash flow to these related entities—entities which were described by an HMG independent director as "one pair of pants with two pockets." Tr. 344–345.

Second, in 1985, Grossman's parent corporation entered bankruptcy. Although this potentially endangered SBA rental revenue from the Grossman's Portfolio, it also suggested the possibility that several, if not all, of the properties in the Portfolio might soon be able to be developed or sold, free and clear of any leasehold.

### D. Gray Suggests That HMG Approach Fieber About A Joint Venture Involving The Purchase Of A Share of the Grossman's Portfolio

In late 1985 or early 1986, Gray suggested to Wiener that they approach Norman Fieber about entering into a joint venture as to the Grossman's Portfolio. The rationale for such a venture was that Fieber could help HMG maximize the development potential of the Portfolio. Since most of the Grossman's properties were in the Northeastern United States and since Fieber had a successful development company in that region, Fieber seemed ideally positioned to help HMG figure out how best to exploit the Portfolio. In particular, Fieber had the know-how to assist HMG in redeveloping properties in the Portfolio to the extent that the Grossman's leases, for whatever reasons, were terminated.

At the time, Gray suggested this idea, Norman Fieber was a member of the HMG Board. He had gained his entrée to that position through Gray, whom he had known for many years and who had introduced Fieber to Wiener in the 1970s.[2] Although Gray and Fieber were not close,

---

2. Fieber thereafter joined the Transco board of directors in 1975.

personal friends, they had a lasting and deep business friendship that involved investing in each other's projects on a thinly-documented basis reflective of substantial mutual trust. Furthermore, Gray knew that Fieber was interested in doing a deal with HMG. Since 1984, Fieber had been interested in pursuing a joint venture with HMG involving the acquisition of shopping centers in Florida. Tr. 1130–1131.

Wiener agreed with Gray that a joint venture with Fieber made business sense. Since Gray had a long-standing relationship with Fieber and since Gray spent a good deal of time in New York, not far from Fieber's Connecticut home, it was agreed that Gray would pursue the idea of a joint venture directly with Fieber.

### E. *Gray Undertakes Negotiations With Fieber*

In early 1986, Gray began to discuss the Grossman's Portfolio on a serious basis with Norman and Jim Fieber. These discussions centered quickly on a basic concept. The Fiebers would buy a percentage interest in the Grossman's Portfolio. A joint venture would be formed, in which the Fiebers would take the lead in managing and redeveloping the properties in the Portfolio. As to a particular Portfolio property close to the Fiebers' base of operations—the property in Wallington, Connecticut ("Wallingford")—the Fiebers would own a super-majority stake because they had a particular interest in redeveloping that property. As to the rest of the Portfolio, the Fiebers would buy a to-be negotiated minority percentage substantial enough to give them a real incentive to maximize returns from the Portfolio.

For the sake of simplicity, I will refer at times to the collective venture between HMG and the Fiebers involving both Wallingford and the Grossman's Portfolio as the "Joint Venture." I will also refer to the transactions involving both collectively as the "Transactions."

The negotiations between Gray and Fieber as to price and percentage of ownership initially centered on Wallingford and were to be consequential for the determination of the terms upon which Fieber later took an interest in the remaining properties in the Portfolio. These negotiations seem to have begun in earnest in February 1986 and to have been spurred on by discussions after an HMG Board meeting that month.

After that meeting, Gray and Fieber discussed the Portfolio. At that time, Gray told Fieber that Martine would be interested in investing in Fieber's side of any Transaction with HMG, if Fieber was going to utilize co-investors to close the deal.[3] Tr. 430–431. Fieber's practice of using co-investors to do transactions was well-known to Gray, since Gray and his partnership, Martine, were frequently among the co-investors in Fieber-led transactions. At trial, Gray testified that he "always knew that [Fieber] used other investors to fill out his package," tr. 545, and that "[Fieber] always asked me to take a piece of his investments." Tr. 550–551.[4]

Fieber testified that Gray said that Gray could not invest on Fieber's side of the deal personally, but that Martine could. Tr. 431, 461. Fieber also testified that he understood Martine to be a partnership owned and operated for the benefit of

**3.** Gray does not deny that such a conversation occurred but says he does not recall it. Tr. 518. His testimony and post-trial brief incline toward the view that Fieber was the one who first suggested that Martine take a buy-side interest in the Transactions. Tr. 518, 544–545; Gray Post–Trial Reply Br. at 2; *but see* Tr. 460 (Fieber says Gray is incorrect and was the initiator). Fieber admits he may have initiated a later discussion that brought

Martine into the larger of the two Transactions. Tr. 463.

**4.** Indeed, Gray—a relentless note taker, accounting ledger maintainer, and financial details man—created a "Norm File" and "Norm Summaries" tracking his many investments with Fieber. *See, e.g.,* PX 43.

members of Gray's family, but not for the benefit of Gray personally. Tr. 358–359.

Fieber claims to have sloughed off Gray's overture by telling Gray that it was too early to talk about co-investors but that he would include Martine if he did bring in other investors. Tr. 431. He also contends that he gave little thought to the propriety of Gray's overture because he "assumed that the person that is president of a listed corporation knows what he's saying . . . [and] knows regulations." Tr. 432; *see also* Tr. 1143.

Neither Gray nor Fieber informed Wiener or any other member of the HMG Board that Gray wished to invest on Fieber's side of the Joint Venture. Instead, Gray proceeded to negotiate the terms of the Joint Venture on behalf of HMG—focussing first on the terms of the Wallingford deal.

In early March, Gray and Fieber discussed the price that Fieber would pay for his share of Wallingford. During that conversation, Gray had a memorandum in his hand from Jim Lavin, the property manager for the Portfolio. The Lavin memorandum described a $300,000 offer for Wallingford, which had been made by an adjoining property owner. In the memo, Lavin recommended rejection of the offer as "below market." PX 36A. Lavin also further recommended updating the 1984 Appraisal on the property and listing the property if a sale was contemplated. The 1984 Appraisal had valued Wallingford at $391,000 on a Leased Fee basis (the "Leased Fee Value") and $711,800 on a Fee Simple (i.e., non-Grossman's lease encumbered) basis (the "Fee Simple Value").

Gray and Fieber deny that Gray disclosed the $300,000 offer to Fieber, yet Gray admits that he had Lavin's memo in his hand when he discussed Wallingford with Fieber. Tr. 523. It is likely that Gray either shared the offer price or targeted price discussions on a price near

that offer. Gray's contemporaneous handwritten notes of his conversation with Fieber—*which are set forth on a copy of the Lavin memorandum*—refer to "$325,000."[5] PX 36A.

As troubling, Gray's notes indicate that Fieber was already contemplating bringing in co-investors on his side of the deal. The notes refer to "Howard Lerner," a personal friend of Fieber's who regularly invests in Fieber-led transactions. PX 36A; Tr. 523–524. Fieber admits telling Gray at that time that Lerner might invest in the deal. Tr. 437. In fact, Lerner was later to become an investor on Fieber's side of the Transactions. The notes also state "syndicate 5 or 6," which I infer to refer to the possibility that Fieber would bring in 5 or 6 investors on his side of the Transactions. PX 36A.

In a subsequent memorandum to Fieber from Gray which was not copied to Wiener or Rothstein, Gray indicated that he would convey the "$325M offer to Maurice on Wallingford." PX 44. That memorandum also indicates that Gray would be forwarding Fieber "information on the [Grossman's Properties] for syndication and or purchase." *Id.* The reference to syndication is disturbing, because it again suggests the active possibility that Fieber would be bringing in co-investors on his side of any deal.

In terms of the percentage split between HMG and Fieber, Gray's notes state: "HMG 1/3" and "Norm Lee 2/3." PX 54. This was the ownership split that was ultimately agreed to regarding Wallingford. Most troubling, of course, is the reference to "Lee" as being part of the "2/3" with "Norm." *Id.*

Gray did as he said and conveyed the $325,000 offer and the proposed ownership split to his colleagues, Wiener and Rothstein. During these discussions at the Adviser level, Gray characterized Fieber as a tough negotiator who was not giving quarter. However, the offer was so far below

---

**5.** I reject Gray's lawyer's claim that the por- tions of the notes I cite were made later.

even the Leased Fee Value that the three of them agreed that the offer should be rejected, but apparently had no problem with the proposal that Fieber buy 66% of the property. Based on his understanding that Gray had been doing his best to get a good deal, Wiener suggested that Gray convey a $400,000 counter-offer roughly tied to the Leased Fee Value of the property. Tr. 103. This was at the lower range of Wiener's price objective, which had been to get a price tied as closely as possible to the Fee Simple Value of the property in the 1984 Appraisals. Tr. 94.

Gray communicated this counter-offer to Norman Fieber's son, Jim Fieber. Tr. 1207. Together, the Fiebers decided to respond with a $350,000 offer. That offer was communicated to HMG by a letter from Jim Fieber to Wiener on March 19, 1986. PX 45.

Wiener, Gray, and Rothstein met to discuss the offer. At that meeting, Gray recommended that HMG accept the offer. I credit Wiener's testimony that Gray said words to the effect, "He only offered 325 to begin with. Now I've gotten him up to 350. It's really been tough and we should take it." Tr. 104. Given the relationship of trust between Gray and Wiener, Wiener would have placed a great deal of weight on Gray's view of the negotiating posture of Fieber. Gray's advice, coupled with the fact that HMG was considering a Joint Venture with one of its own directors posited on future cooperation, was a very important factor in Wiener's and Rothstein's decision-making process.[6]

Based on Gray's advice, the three of them decided to accept Fieber's $350,000 offer, that is, to accept Fieber's offer to pay $233,450 to buy two-thirds of the property. Tr. 103, 197–198. This decision was significant in more than the obvious way.

By accepting a price at less than Leased Fee Value, HMG set a precedent for the next phase of the negotiations, which would focus on the remaining properties in the Portfolio. In essence, the Wallingford price centered the remaining negotiations on the Leased Fee Value, and left Wiener and Rothstein with the impression that there was no viable way to get Fieber to pay anything close to the Fee Simple Value. Thus, HMG's earlier goal of getting a price at or near that value was essentially abandoned.

### F. HMG and Fieber Negotiate The Sale of the Portfolio Properties

Once the Wallingford Transaction's terms were more or less finalized, HMG and the Fiebers turned their attention to the terms on which the parties would enter a Joint Venture regarding the remaining 33 properties in the Portfolio. Frankly, the evidence regarding this aspect of the negotiations is quite sketchy. For the sake of clarity, this Transaction will be sometimes called the "NAF Transaction," since the Joint Venture vehicle created by Norman Fieber to hold his side of the Joint Venture is called NAF Associates.

In the wake of agreement on the terms of the Wallingford deal, it is my sense that Wiener was anxious to close on the NAF Transaction. Gray continued to lead HMG's efforts in that regard and to be in close contact with both Norman and Jim Fieber. By this point, Wiener and Rothstein had formed the view, based on Gray's depiction of Fieber's negotiating position in the Wallingford Transaction, that they could not get Fieber to pay a price at or approaching the Fee Simple Value in the 1984 Appraisals. While still willing to do a deal with Fieber, Wiener and Rothstein, with no objection from Gray, set the Leased Fee Value as a floor for the NAF

---

**6.** In defending this case, Gray contends that his style of not speaking at board meetings or other large meetings and of allowing Wiener to do so demonstrates that Wiener was the dominant player in the Transactions. The fact that Gray reserved his influence for Ad-viser-level discussions or face-to-face negotiations with Fieber does not render him non-influential. A multi-volume treatise could be written on the extraordinary power wielded by the taciturn within complex organizations.

Transaction. It was Gray's job to bring the Transaction to closure.

Much of the parties' attention regarding the NAF Transaction negotiations is focussed on whether a meeting among Wiener, Gray, Rothstein, Norman Fieber, and Jim Fieber at the Stamford, Connecticut Sheraton Hotel occurred in April or May of 1986. Both the defendants contend that the meeting occurred in early to mid-April. They assert that the meeting focussed on the economic terms of the NAF Transaction and that the two principal spokespersons at the meeting were Wiener for HMG and Jim Fieber on behalf of his father.

According to the defendants, Jim Fieber negotiated at that meeting for a price based on less than the Leased Fee Value. Jim Fieber premised his argument on the potential environmental problems at some of the sites and other factors that made their development potential less than certain. In response, Wiener is said to have insisted that the Fiebers either take a deal based on the Leased Fee Value or leave it. Tr. 1137. Norman Fieber assented to that demand, subject to a review of all the 1984 Appraisals, clear title, and inspection of the properties. Tr. 457, 1137–1138, 1219–1220. At the end of the meeting, the parties allegedly agreed to move the Wallingford and NAF Transactions to closure as rapidly as possible. Tr. 1224.

For its part, HMG, through the testimony of Wiener and Rothstein, places the meeting in May, after the Wallingford transaction had closed and after, they say, the basic economic terms of the NAF Transaction had been agreed upon. They contend that the meeting was not intended as a negotiation, but as an opportunity for HMG to sit down face-to-face with Fieber and to get a read on how enthusiastic he was to undertake the Joint Venture and to discuss how the Joint Venture would operate.

It rings truer to me that the Sheraton meeting occurred in May or early June for the primary purpose HMG articulates than that it occurred in April for the purpose articulated by the defendants. The only documentary evidence of the Sheraton meeting is contained in handwritten notes by Jim Fieber dated "6/86" which list as item-number five "meeting NAF, LG, MW Sheraton Town Centre." DX 40. This document indicates that negotiations regarding the structure of the Joint Venture were still on-going as of that date because it also refers to a "meeting & negotiation" with Rothstein in New York City on July 1, 1986. *Id.* A May or June date is also more consistent with the defendants' own testimony that the parties agreed to move the Transaction to closure rapidly, since the Transaction closed on July 15, 1986—a closing date that was certainly not rapid as measured from April. The Fiebers' rather erratic memory of the Sheraton meeting, *see* N. Fieber 60 (originally testifying that the meeting occurred in June); J. Fieber 145 (not recalling whether Rothstein attended), and the fact that I found Wiener and Rothstein to be more credible witnesses than the defendants also lead me to conclude that it is slightly more likely that the meeting occurred in May or June.

On the other hand, I acknowledge the force of the defendants' contrary argument. That argument draws strength from a flurry of activity in the latter part of April that is indicative of parties attempting to reach agreement on a transaction, activity I will describe in a moment.

Before discussing the defendants' key evidence regarding the date of the Sheraton meeting, let me emphasize that I place far less weight on that issue than do they. Unlike them, I do not find the timing issue to be critical for the following reason. By April, Wiener and Rothstein believed that Gray had been duking it out with Fieber since February. While they had bought into Gray's view that HMG could not get a price near the Fee Simple Value, they had drawn a bottom line at the Leased Fee Value.

By the time Jim Fieber tried to get an even lower value than that at the Sheraton

meeting (whether in April, May, or even June), Wiener and Rothstein believed that Gray had already communicated that bottom line to the Fiebers and that the Fiebers understood and had agreed to it. I part from the defendants in believing that this means that Wiener, rather than Gray, was the most influential person at HMG in terms of setting the price. To the contrary, Wiener and Rothstein premised their position on price on Gray's earlier unsuccessful efforts to get a higher price on Wallingford and his reports of Fieber's tough, almost unyielding negotiating stance. By the end of an over two month period of negotiations, Wiener and Rothstein were not prepared to haggle further. They wanted to get a deal done or move on.

This view of the evidence is consistent with what happened in late April. On April 22, 1986, Gray wrote to Norman Fieber regarding appraisals the Fiebers had requested. PX 56. The next day Gray wrote to Jim Fieber twice, urging him to put an offer at Leased Fee Value in writing. PX 57, 58. In fact, Gray went so far as to enclose a draft of the offer letter. PX 58. Although Gray testified that he did so at Wiener's instruction, I disbelieve his testimony since he did not bother to copy Wiener on his correspondence to Jim Fieber.[7]

Continuing the pattern of references to his own interest in Fieber's side of the deal, Gray's files contain a document attached to the draft offer letter setting forth Gray's calculations of the purchase price. The word "Martine" is written on the note. PX 38 at M0016.

The same day Rothstein wrote to HMG's outside counsel about the proposed Transactions and directed him to draft an agreement for the Joint Venture modeled on the SBA joint venture. PX 59. That letter said that HMG would hold 65% of the NAF Transaction Joint Venture and

Fieber would hold 35%—the percentages that were used in the final Transaction.

On April 24, 1986, Jim Fieber sent an offer letter to Wiener, based substantially on the text sent to him the previous day by Gray. DX 153. The April 24 letter contained the essential terms that were to be incorporated in the final NAF Transaction.

Unlike the defendants, I believe the Fiebers' April 24, 1986 offer at Leased Fee Value is as consistent with a May date for the Sheraton meeting as with an April date. This is so for two reasons. First, none of the late April documents refer to the Sheraton meeting, which is odd if it was the meeting that produced the agreement in principle. Second, it makes sense to me that the Joint Venture partners would meet face-to-face after the economic terms were set to discuss how to proceed and begin to cement a working relationship, especially since the Joint Venture agreements were still being negotiated well into June. *See, e.g.*, PX 417. To the extent Jim Fieber used such an occasion to attempt to retrade the April 24, 1986 offer price, this would explain Wiener's supposed "take it or leave it" approach. Bolstering the May meeting theory is Norman Fieber's June 24, 1986 letter confirming the price of the NAF Transaction at a price tied to the Leased Fee Value and indicating that closing would occur on July 15, 1986 or sooner. PX 87. This letter—drafted by Gray and typed by Gray's secretary in New York—is consistent with a later date for the Sheraton meeting and with the notion that Jim Fieber was attempting to renegotiate the earlier agreement in principle based on his due diligence subsequent to April 24, 1986.

### G. *The Final Terms of the Transactions*

The final terms of the Wallingford Transaction required the Fiebers to pay $233,450, or two-thirds of $350,000, to HMG and Transco in proportion to those

---

7. As noted previously, Gray is a meticulous man who is a relentless notetaker and document retainer. It is striking how often he

copied Wiener and Rothstein on documents that do not raise an illicit reference, while failing to do so as to documents that do.

entities' respective interests in the Wallingford property. In exchange, HMG conveyed a one-half interest and Transco conveyed a one-sixth interest in the Wallingford property to the Fiebers.

The final terms of the NAF Transaction required the Fiebers to pay to NAF $2,137,161 in cash, a price proportionate to 35% of the Leased Fee Value of the Grossman's Portfolio. The Fiebers also assumed 35% of the liabilities of the Portfolio. In exchange, HMG conveyed a 35% interest in the Grossman's Portfolio to NAF. To facilitate this exchange, HMG engaged in an earlier transaction in which it purchased Transco's 25% share of the Grossman's Portfolio at a price also based on the Leased Fee Value. As a result, HMG's overall ownership interest in the Grossman's Portfolio dropped from 75% to 65%.

### H. *Gray Takes a Buy–Side Interest In The Wallingford Transaction*

The Wallingford Transaction closed on May 1, 1986. Gray signed the deeds granting the Fiebers ownership of two-thirds of the property. Unknown to Wiener or Rothstein, however, Gray, at Fieber's invitation, had joined a group of investors on the Fiebers' side of the transaction. Through Martine, Gray invested $55,000 in the Wallingford Transaction, by a check dated May 1, 1986—the same date the Transaction closed. Howard Lerner and Jim Fieber also invested in the Transaction.

There is no evidence that Gray's interest in Martine was disclosed in any manner to HMG at that time.

### I. *The Fiebers Seek Out Other Investors For The Transactions*

The Fiebers claim that they decided to involve other investors only after the economic terms of the Wallingford Transaction had been finalized. They say that their decision to do so was based on a site visit Jim Fieber conducted subsequent to the agreement in principle. During that site visit and during his inspection of certain publicly recorded documents regarding the property, Jim Fieber learned that the property—principally because it was covered by extensive wetlands—did not have the shopping center development potential the Fiebers had counted on. As a consequence, the Fiebers decided to bring in other investors to reduce the risk. Tr. 1146, 1226. Even though Norman Fieber was HMG's fiduciary, the Fiebers did not inform their Joint Venture partner HMG that they now viewed the development potential of Wallingford as compromised. Tr. 1281–1283.

The Fiebers tell a similar story regarding their decision to bring investors into the NAF Transaction. After the late April agreement-in-principle, the Fiebers undertook a due diligence review of the Appraisals and conducted site inspections. Upon doing so, they concluded that the Grossman's Portfolio was a much riskier investment than they had initially thought. Therefore, they again decided to limit their risk by taking in other investors. Tr. 1139–1140, 1237–1238. Again, the Fiebers did not inform HMG that they viewed the development potential of the Portfolio as less attractive than they originally thought. Tr. 1286–1287.

The Fiebers contend that they had no intention to include Martine as one of the investors in NAF until after the Wallingford Transaction closed. Rather, their intention as to NAF was to split their 35% stake on an equal basis with Stephen Hoffman, another Connecticut developer with whom they had invested in the past. In early May 1986, Hoffman considered undertaking such an investment but ultimately decided against it. Tr. 923–924. Thereafter, Milton Mann, another real estate investor, also turned the Fiebers down. Tr. 1145, 1240.

Only once these events occurred, the Fiebers say, did they turn to the investors who ultimately became their partners in the NAF Transaction. These investors, who came together to form the partnership

known as NAF Associates, included: Norman Fieber, Jim Fieber, Howard Lerner, Auburn Investors Ltd., Jay Kaplan, Melvan Kaplan, Sheila Marin, Stanley Fieber, *and Martine.*

After considering the evidence bearing on this question, I conclude that the Fiebers knew that they would probably utilize co-investors from the time they began discussing the Wallingford and NAF Transactions with HMG. Although they may not have been certain about that, they were inclined toward and open to that prospect throughout the course of their negotiations of the Transactions. Equally important, I find that to the extent that Norman Fieber was inclined to utilize co-investors, he was also inclined to include Gray among their number.

Several factors lead me to this conclusion. First, Norman Fieber used co-investors on a regular basis. In particular, Norman Fieber would include co-investors with whom he had a close and trusting business relationship. Given his style of business, he was not likely to exclude such investors if they were willing and capable of participating. Second, Norman Fieber was clearly considering co-investors as early as February 1986, including Howard Lerner, a regular Fieber co-investor who ended up as an investor in the Wallingford and NAF Transactions. PX 36A; *see also* Tr. 437. Third, Norman Fieber, while a man of some means, was not so wealthy that he was likely to invest well over $2 million of his own money in one project. In fact, in December 1985, Norman Fieber had received $60,000 from Gray so as to cut Fieber's previous $120,000 investment in a project in half because Fieber needed "somebody to help him" because he was involved "in too many other things." Tr. 376–377; PX 407. Finally, I believe that once Norman Fieber decided to take in investors on Wallingford, he became virtually certain to do so with regard to the NAF Transaction. To the extent that the Fiebers desired to reduce risk on an investment of only $233,450, it is difficult for

me to conceive that they would not also seek to do so with regard to an investment ten times that amount.

Nor am I persuaded by Norman Fieber's contention that in early May 1986 he did not intend to take investors other than Stephen Hoffman into NAF. Although I do not disbelieve Hoffman's testimony that he was offered 50% of the Fiebers' share, that testimony is not inconsistent with the prospect that the Fiebers would take in other investors, and reduce their overall percentage even further. Tr. 930–931. Given the Fiebers' intent to charge a management fee, such a reduced percentage still gave them a healthy incentive to participate. Moreover, a decision to eschew other investors and cut out long-time co-investors like Gray and Lerner seems out of keeping with Norman Fieber's way of doing business.

In so concluding, I do not find that Norman Fieber definitely intended to include Gray, through Martine, as a co-investor in the Wallingford and NAF Transactions. I do find that while Norman Fieber was negotiating the Transactions with Gray he knew it was likely that he would take in co-investors and that to the extent that eventuality came to pass that Gray would be invited to participate.

### J. Gray Conceals His Interest In The Transactions From the HMG Executive Committee

On June 16, 1986, the Executive Committee of the HMG Board met to consider whether to ratify the Wallingford Transaction. Gray attended in his capacity as a member of the Executive Committee.

Despite the fact that Martine had taken a buy-side interest in the Wallingford Transaction, Gray voted to ratify the Transaction. He did not disclose Martine's interest in the Transaction. Tr. 546–547.

### K. Gray and Fieber Mislead HMG About The Identity of The "NAF Associates"

In preparation for closing the NAF Transaction, HMG requested a copy of the

NAF partnership agreement so that it could, among other things, learn the identity of the Fiebers' co-investors. Tr. 120–121. The Fiebers sent a copy of the agreement to HMG. The copy sent to HMG identified each of the partners in NAF, including Martine.

However, the agreement indicated Martine's address as being located at "62 Fox Ridge Road, Stamford, Connecticut 06903." PX 106. That address is Norman Fieber's home address, a location with no proper connection to Martine. The address accorded with HMG's understanding that Fieber's co-investors were friends and members of his family. Tr. 120–121, 651–652.

The use of Norman Fieber's address on the partnership agreement was, I am certain, not inadvertent. An earlier draft of the partnership agreement listed Martine's address at Gray's office in Larchmont, New York, a proper address. PX 97.

The only question is whether Gray is solely responsible for the change or whether the Fiebers conspired with him to change the agreement. The Fiebers point the finger directly at Gray and claim to have no direct knowledge of how the address was changed.

In support of this contention, the Fiebers point to handwritten notes of Jim Fieber that he made while attempting to compile information from the prospective NAF partners so as to complete the partnership agreement. With respect to Martine, Jim Fieber's notes state:

> Martine Avenue Associates
> Partner=Betsy Robbins/LG mother
> Send c/o LG's address in Larchmont
> Per LG

DX 124; Tr. 1242–1245. They assert that between the time of the original draft partnership agreement, which had the correct address, and the time that the final draft was prepared using Norman Fieber's address, it is likely that Gray called the Fiebers' office and asked a member of the clerical staff to change the address. Tr. 470–471. In support of this contention, they cite Gray's habit of contacting the Fiebers' clerical staff about other matters.

For his part, Gray says he does not know how Martine's address came to be identified as Norman Fieber's home. Tr. 552. At trial, he said, "I've been racking my brain.... I have no idea. I never saw that agreement." *Id.* As if the address mystery were not enough, the process by which Martine executed the partnership agreement is also highly suspect. Shortly before closing, HMG's outside counsel asked Jim Fieber for an executed copy of the partnership agreement.

According to Jim Fieber, he called Gray to ask for a copy executed on Martine's behalf. Gray, Jim Fieber contends, said he was not a partner in Martine and could not sign. Gray therefore suggested that Jim Fieber sign on Martine's behalf. Jim Fieber replied that he could not do so without a partner's authorization. Gray responded by saying that he could not sign the authorization, but that he would arrange to have his sister, Saffell,[8] send a letter authorizing Jim Fieber to sign the agreement on Martine's behalf. Tr. 1246–1247, 1322–1324. In a letter dated July 22, 1986, Saffell wrote to Jim Fieber stating:

> This is authorization for you to act as our Trustee for Martine Avenue Associates in the partnership NAF Associates. I am a general partner in Martine Avenue Associates and am authorized to grant you this power.

PX 111. After receiving this letter, Jim Fieber executed the partnership agreement on Martine's behalf. Tr. 1332–1334.

Both of the Fiebers claim to have placed no significance on any of these events or on the addresses in the partnership agreement. They say they were small businessmen concentrating on getting a deal done, and non-material details such as addresses or how authorizations were obtained sim-

---

**8.** Then known as Betsy *Gray* Robbins. *See* PX 111.

ply did not capture their attention. Tr. 467, 1313–1317. Jim Fieber now recognizes that it would have been much more efficient to have had Saffell execute the partnership agreement and send it to him, than for him to have sent her a letter, received a letter in return, and executed the partnership agreement himself. Tr. 1320–1326. He contends that he did not think about that at the time because he was focussed on closing the deal. *Id.*

Gray's version of how his sister came to send an authorization letter to Jim Fieber directly contradicts Jim Fieber's testimony. According to Gray, Jim Fieber called him and asked for a letter from Gray's sister authorizing Fieber to sign the partnership agreement on behalf of Martine. Tr. 553–556. Jim Fieber then dictated the authorization letter to Gray's secretary and that letter was then sent to Saffell who signed it and returned it to Jim Fieber. Tr. 556–557. Gray denies telling Jim Fieber that he was not a partner in Martine. Tr. 560.[9] Like the Fiebers, Gray cannot explain why the most efficient course (Gray signing the agreement) or the second most efficient course (Saffell signing the agreement) was not chosen, except to argue that the way he and Jim Fieber did it was somehow "simpler." Tr. 558–559.

It is, of course, impossible for me to determine with any degree of certainty exactly how the address in the partnership agreement came to be changed and who made the decision to have Jim Fieber execute the partnership agreement on Martine's behalf.

I do conclude with certainty that Gray helped bring about the change in address so as to conceal his interest in Martine

from HMG. I also believe that Gray helped cause the execution of the agreement through Jim Fieber for an identical reason.

With less certainty, I also conclude that the Fiebers knew about the address change at the time and sent a NAF partnership agreement to HMG knowing it contained a false address for Martine. Jim Fieber appeared to be a credible witness at trial. But I am deeply troubled by the fact that at trial he admitted to being the principal draftsman of the partnership agreement, yet in his deposition had no recollection at all of how that agreement came to be prepared. *Compare* Tr. 1241–1243 *with* J. Fieber 127–128. At trial, Jim Fieber also admitted to being involved in other changes to the agreement, *e.g.*, tr. 1311–1312, and in his deposition admitted to knowing that another partner's address was changed from Norman Fieber's home in the earlier draft to its proper business address in the final draft. J. Fieber 129–130. Yet, he claims to have no knowledge of how or why Martine's address was changed in the opposite direction—from a correct address to Norman Fieber's home.

I am also dubious about the Fiebers' assertion that a member of their support staff would insert Norman Fieber's home address in a contract without their permission. Although I can imagine that Gray could be quite influential with a member of the Fiebers' support staff given his documented communication style, I would think that the member would have checked to see if what Gray had wanted was okay with Norman or Jim Fieber. A request by even a regular investor like Gray to use Norman Fieber's address is not one likely to be granted by a clerical employee without authorization from a superior.[10]

9. He also denies ever leading Norman Fieber to believe that he was not a Martine partner. Tr. 560.

10. My doubts regarding the Fiebers' ignorance of the address change are heightened by Norman Fieber's rather odd deposition testimony on the subject. In his deposition, Fieber denied knowing how the address came

to be changed in the agreement or even whether his son had drafted the agreement. N. Fieber 122, 129. But in that same testimony, Fieber says that at one time Gray told him to use Fieber's address for Martine and purported to explain why that made sense. N. Fieber 120–123.

I have even greater doubt that the Fiebers did not know it was fishy that Gray wanted Jim Fieber to execute the NAF partnership agreement. The NAF Transaction was not the first time that Norman Fieber had dealt with Martine through Gray and it was not to be the last. Yet, this is the *only* occasion in which the Fiebers did not proceed with Martine solely utilizing Gray's authorization. At best, the Fiebers appear to have purposely closed their eyes and held their noses and went along with whatever Gray asked without inquiring why Gray wished to proceed in the manner he did. At worst, they knew exactly why—it was after all quite obvious—Gray wanted to have Jim Fieber sign and agreed to that request.

### L. *The NAF Transaction Closes*

On July 15, 1986, the NAF Transaction closed. HMG and the Fiebers agreed that the Joint Venture was to be governed by a board comprised of two representatives from HMG and two representatives from NAF.

On July 7, 1986, NAF Associates had been created to accomplish the NAF Transaction. That day, Martine invested $300,000 in NAF and became its first investor. PX 160; Tr. 565–566. As a result, Martine acquired a 13.02% stake in NAF.

### M. *Gray and Fieber Fail To Disclose Martine's Interest To HMG's Board of Directors*

On August 18, 1986, the HMG Board met to consider whether to ratify the Wallingford and NAF Transactions. Both Gray and Fieber attended the meeting in their capacity as directors.

Neither disclosed Martine's interest in the Transactions. Norman Fieber claims that he knew that Martine was owned by Gray's family, tr. 359, but "did not think

about" disclosing that fact. Tr. 1164, 1167–1168. Gray contends that, as he "looks back," he made a conscious decision not to disclose his interest because in his judgment his interest in the Transactions was immaterial. Tr. 1070.

Norman Fieber did abstain from voting on the Transactions because of his own personal interest. Tr. 358–360. Gray did not abstain and voted to ratify them.[11]

### N. *Fieber Receives Post–Closing Evidence of Gray's Partnership Interest In Martine*

Norman Fieber claims that from 1986 until 1996 he had no knowledge that Gray was a partner and owner of Martine. He asserts this claim in the face of a great deal of evidence suggesting that he was well aware that Gray was a partner in Martine. *See, e.g.,* Tr. 561. The totality of the evidence regarding Fieber's and Gray's business interactions is far too abundant to describe in detail. Suffice to say that Martine, through Gray, invested in six major projects with Fieber over an eighteen year period. In connection with these investments, Fieber never dealt with any representative of Martine other than Gray. Tr. 360. Indeed, he never met Gray's sister Saffell until the trial occurred. Tr. 1125.

Gray was no quiet, passive investor. He made his views known to Fieber on a regular basis and watched over every dime of Martine's investments with care.

Perhaps the most compelling piece of evidence regarding Fieber's knowledge of Gray's status as a partner and owner of Martine is a letter sent to Fieber in connection with Fieber's own investment of $75,000 in Martine. This investment was made in November 1986 and apparently gave Fieber a stake in a farm Martine had purchased in Millerton, New York.[12] On

---

11. None of the other three HMG directors who voted to ratify the Transactions had a conflict of any kind.

12. I say apparently because Gray's and Fieber's trial and deposition testimony about the nature and purpose of this investment were quite confusing. Despite that confusion, I do not draw the illicit inferences (that it was a

November 24, 1986, Gray sent Fieber a letter acknowledging receipt of the $75,000 on behalf of Martine and signed his name as "partner" of that partnership. PX 138; *see also* Tr. 561.

Fieber contends that he took no notice of this letter. He takes the same position as to another limited partnership agreement he executed that lists Gray as a general partner of Martine. PX 288. Similarly, he sloughs off numerous other documents sent to him by Gray. In these documents, Gray clearly signals his personal interest in Martine. For example, Gray battled with Fieber about the management fees the Fiebers charged the NAF partners. In connection with that dispute, Gray wrote several heated notes to Fieber indicating statements such as "I just want out;" "send me my 13.02%;" send "my % of each check directly to me;" and "I have a better idea—I'll withdraw." PX 289 at NORM2–0018–0019; *see also* PX 409 (note regarding Lambert investment involving Fieber and Gray and describing relevant investment as "Our Lambert' (AL, LG & NF)").[13]

Nor, Fieber says, did he take note of the fact that Gray personally guaranteed large loans regarding investments in which Martine was the investor. *See, e.g.*, PX 15 (personal guarantee of $1.25 million loan for Lambert investment Gray made with Fieber through Martine). Gray executed one such guarantee in connection with a loan NAF itself took from Union Trust in 1987. *See* PX 179; *see also* PX 183. That year, NAF took out a $750,000 loan at Gray's strong urging. PX 157, 171, 172. The loan proceeds were immediately paid out to the partners, including Martine.

The Fiebers, through a letter from Jim Fieber, required each of the NAF partners to sign the note to Union Trust. PX 179. Gray executed the note on behalf of Martine, signing on the same page as Norman and Jim Fieber. PX 180.

Given the constant contact between Fieber and Gray, the abundant evidence of Gray's personal concern about the investments, and the direct evidence that Fieber saw documents indicating that Gray was a partner of Martine, I do not believe that Fieber was ignorant of Gray's ownership interest in Martine. Certainly, by the end of 1986, he knew of that interest. And to the extent that Fieber blinded himself to the fact that Gray had an ownership interest in Martine, Fieber certainly knew that Gray's interest in Martine's health and success *was equal to or greater than* the concern Gray would have had for an investment Gray held personally.

Bolstering my view in these regards is the curious role of Jim Fieber. In 1986, Jim Fieber supposedly had to get a letter from Gray's sister to execute the NAF partnership agreement on behalf of Martine. But by 1987, Jim Fieber was sending Gray letters addressed to "Dear Partner," and asking Gray to personally sign a $750,000 note on behalf of Martine. PX 179, 180. How come? Didn't this ring any bells? Why didn't Jim Fieber say, "Hey Dad, how come Lee Gray can sign this year and he couldn't last year?" Although Jim Fieber was putting his short legal career behind for a career in real estate, it is hard for me to believe that an intelligent young lawyer fresh out of a respected law firm would not be troubled by this apparent inconsistency.[14]

---

sham to repay Gray for helping Fieber facilitate the Wallingford and NAF Transactions at an inadequate price) from that investment that HMG does.

13. I note that HMG had presented evidence sufficient to support a finding that Gray and Fieber engaged in at least one other sales transaction, the so-called "Lambert II" transaction, with a corporation on whose board Gray served in which Gray took an undis-

closed buy-side interest. This evidence buttresses my conclusion that Fieber's and Gray's acts were not inadvertent and that Fieber was not unwitting as to Gray's strong, personal interest in Martine.

14. At trial, Jim Fieber tried to lay blame for this on his assistant, who typed the letters for him. Tr. 1248–1249. I find the Fiebers' assertion that their clerical help is responsible for so many suspicious things incredible.

Despite the abundant evidence they possessed of Gray's economic interest in Martine, neither of the Fiebers did anything to bring Gray's interest to the attention of the HMG Board.

O. *Gray and Fieber File False Disclosures With The HMG Board That Result In Misdisclosures To HMG's Public Shareholders*

Each year, HMG asks its directors to fill out a disclosure document designed in large measure to identify possible conflicts of interest and to help the company meet its disclosure obligations under the federal securities laws. The disclosure questionnaire states in particular that:

> *Please report all transactions with the Company, whether or not you consider them to be material. Each transaction will be reviewed by counsel for materiality . . .*

### 3. *TRANSACTIONS WITH THE COMPANY OR THE ADVISER.*

(a) *Please state whether (1) you, any associate,\* or any member of your immediate family,\* or (2) to your knowledge, any holder of 5% or more of the shares of the Company or the Adviser had any interest, direct or indirect, in any transactions since December 31, 1985, or in any presently proposed transaction, to which the Company or the Adviser was or is to be a party.* (b) If the answer is "Yes", describe the transaction or transactions, naming the person or persons interested, and stating each person's relationship to the Company or the Adviser, the nature of each person's interest in the transaction, the amount of the transaction and the amount of each person's interest in the

transaction. In the case of a sale of assets, other than in the ordinary course of business, state the cost of the assets to the purchaser, and, if acquired within the last two years, the cost to the seller, and indicate the method used in determining the cost to the purchaser and the person making the determination.

### APPENDIX

### *CERTAIN TERMS USED IN QUESTIONNAIRE*

\* \* \* \* \* \*

*'Family Relationship'*

The term 'family relationship' means any relationship by blood, marriage or adoption, not more remote than first cousin.

\* \* \* \* \* \*

*'Immediate Family'*

A person's immediate family includes that person's spouse, *parents*, children, *siblings*, mothers and fathers-in-law, sons and daughters-in-law, and brothers and sisters-in-law.

DX 196 (emphasis added).

During the period 1987 to 1996, Norman Fieber filled out such questionnaires without disclosing his knowledge that Martine had invested in the Wallingford and NAF Transactions. *See, e.g.,* DX 196 (3/17/87 questionnaire response). He did so despite possessing clear evidence as of November 24, 1986 that Martine was owned by Gray, as well as members of Gray's family.[15] Gray also filled out such questionnaires annually during this period, none of which disclosed Martine's interest in the Transactions.

Gray and Fieber also signed the company's 10–Ks during these years, all of which

And even if true, the Fiebers are responsible for the acts of their agents. Jim Fieber's further testimony that he didn't view it as unusual for a person to guarantee a *$750,000* obligation for fellow family members supports my view that in the Fiebers' world, one's

family's interest is one's *personal* interest. Tr. 1249–1250; *see also* Tr. 1128.

**15.** The obvious "family" focus of the questionnaires should have also alerted Fieber to his duty to disclose Martine's interest.

failed to disclose Martine's interest in the Transactions.

P. *The Joint Ventures Turn Handsome Profits, But Not In The Way Originally Contemplated By The Joint Venturers*

One of the few things that HMG and the defendants agreed upon at trial was that the original intention of HMG and the Fiebers was to redevelop the Wallingford Property and at least some of the Grossman's Portfolio as properties came off lease from the Grossman's stores. As events turned out, that is not what happened.

Over the course of the succeeding decade, many of the properties came off lease. Yet, none of them was redeveloped. Instead, the properties were sold at prices generally well in excess of the Fee Simple Values contained in the 1984 Appraisals.

While HMG made an effort at trial to show that the lack of redevelopment efforts was caused by Gray and Fieber, I am persuaded that HMG (through Wiener principally) and Norman Fieber jointly decided to sell properties rather than to redevelop them. Since the venturers made handsome profits in this less risky manner, their decision was, at the very least, rational.

Although the lack of redevelopment meant that one of the primary assets the Fiebers brought to the Transactions has been to date little utilized—their development ability—there is no evidence that HMG pressed or even encouraged the Fiebers to redevelop rather than sell properties. In fact, several of the documents HMG cites as demonstrating that Gray wished to maximize current returns through sales are copied to Wiener and Rothstein, and implicitly indicate the Ad-

viser's collective interest in such an approach. PX 178, 219.

The only witness who persuaded me at all that he was eagerly interested in redeveloping, rather than selling, some of the properties was Jim Fieber. The other players seemed content to reap the rewards of appreciation in the Portfolio's value through favorable sales transactions.[16]

By October 1997, the Joint Venture had sold Wallingford and 22 of the 33 properties included in the NAF Transaction. The transactions produced returns 46.5% higher than the Leased Fee Values for the properties as set forth in the 1984 Appraisals. PX 411 (also reflecting 22.5% higher return than Fee Simple Values).

The sale of the Wallingford property resulted in distributions of $969,078 to Fieber's Wallingford investors, as compared to their $233,500 cost of investment. The NAF partners received $5,258,236 as a result of the Portfolio sales, as compared to their $2,196,500 [17] cost of investment. Substantial future profits to the NAF partners are still expected from the remaining properties in the Portfolio. The annualized returns produced by the Joint Venture far outstripped the performance of the commercial real estate market during the same time period. PX 375A at 10.

Q. *HMG's Board Discovers Martine's Interest*

It was not until October of 1996 that Wiener and Rothstein first learned of Gray's interest in the NAF Transaction. During September 1996, the Joint Venture's real estate administrator, Lavin, inquired about the identity of the individual partners of NAF for Maine state tax withholding purposes in connection with a property sale. As a result of that inquiry,

---

16. Admittedly, Gray quibbled with the management fee the Fiebers charged the NAF partners in view of the fact that no redevelopment was going on and that there was also a property manager for all the properties owned by the Joint Venture.

17. In 1993, the NAF investors made another cash contribution of $59,500, which explains the increase from the $2,137,161 they originally invested. Tr. 805.

Lavin learned that Gray and Saffell were Martine's partners. After discovering this, Lavin informed Rothstein and Wiener. Thereafter, Gray confirmed his interest in NAF to Wiener. Tr. 1088.

On November 15, 1986, the HMG Board met and was informed of Gray's interest. The Board authorized an investigation into the matter. During that investigation, HMG learned that Martine also had an interest in the Wallingford Transaction.[18] Shortly thereafter, Gray dissolved Martine without disclosure to HMG.

At the end of its investigation, the Board concluded that Gray and Fieber had breached their fiduciary duties and should leave the HMG Board and that Gray should resign his management position with HMG. In addition, the Adviser's contract was terminated and HMG contracted with a new entity for advice. That entity was identical to the Adviser, but was not owned or affiliated in any way with Gray. Instead, Wiener controlled that entity.[19] Tr. 209.

On July 2, 1997, HMG commenced this litigation.

## II. *Analysis of HMG's Claims*

HMG brings three major claims. As to defendants Gray and Norman Fieber, HMG claims that they breached their fiduciary duties and defrauded the company. As to defendant Saffell, HMG claims that she is liable as an aider and abettor of defendant Gray and as a former partner in the now dissolved Martine.[20] I will address each of these claims, beginning with the fiduciary duty claims.

18. Sadly, it appears that Gray hesitated to disclose his interest in Wallingford after HMG discovered his interest in the NAF Transaction. PX 4, 304; Tr. 1105–1106.

19. I reject Gray's assertion that this litigation is a pretext by Wiener to squeeze Gray out of his interest in the Adviser.

20. HMG also pled a conspiracy claim against all three of these defendants. HMG did not brief this claim in its post-trial briefs and I see no reason to reach the claim as to Gray and

## A. *Breach of Fiduciary Duty*

### 1. *The Appropriate Burden of Proof*

■ HMG contends that Gray and Norman Fieber engaged in self-dealing and therefore they bear the burden to demonstrate the entire fairness of the Transactions. For his part, Fieber claims that Gray's interest in the Transactions was immaterial and therefore the HMG Board's decision to ratify the Transactions was a proper exercise of discretion subject to protection by the business judgment rule. Gray concedes that the defendants had the initial burden to demonstrate fairness and claims that they have done so without rebuttal from HMG. Gray Post–Trial Br. at 12.[21]

Both HMG and Fieber initially focussed their attention on the business judgment rule, with much less emphasis on 8 *Del. C.* § 144. But this case directly implicates both the business judgment rule and § 144. Even though the business judgment rule and § 144 serve somewhat different purposes and cannot be interpreted identically, they are closely related.

Therefore, in two important decisions in a case where the statute was not literally implicated, the Delaware Supreme Court stressed the relevance of § 144 and attempted to conform its application of the business judgment rule to adhere to the statute's core concerns. *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156, 1169–1170 (1995) (subsequent history omitted); *Cede & Co. v. Technicolor, Inc.* *("Cede II")*, Del.Supr., 634 A.2d 345, 365–366 (1993) (subsequent history omitted).[22]

Fieber in view of my disposition of HMG's other claims.

21. Gray does agree with Fieber's contention that Gray's personal interest was too immaterial to have affected the outcome of the HMG Board's vote on the Transactions or to justify a rescissory damages award. Gray Post Trial Br. at 17–19.

22. *See also Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984) (Citing § 144(a) for the proposition that if self-dealing is present and

Respect for that teaching and for the General Assembly dictates that in a case where § 144 is directly applicable, compliance with its terms should be a minimum requirement to retain the protection of the business judgment rule. *Cede II*, 634 A.2d at 366 n. 34 (satisfaction of one of § 144(a)(1), (2), or (3) "permits an otherwise interested transaction to be brought within the protection of the business judgment rule"). The desirability of doctrinal and statutory coherence, where that can be accomplished without sacrificing public policy interests, also counsels that conclusion. In this case, both the business judgment rule as traditionally interpreted and § 144 point toward the entire fairness standard as the appropriate form of review.

"As a procedural guide the business judgment presumption is a rule of evidence that places the initial burden of proof on the plaintiff." *Cinerama*, Del. Supr., 663 A.2d at 1162 (emphasis omitted). Fieber contends that my burden shifting analysis must focus on the standard articulated in *Cinerama* and *Cede II* to address situations where a director has an indirect or incidental interest in a transaction with the corporation. That standard requires a plaintiff wishing to rebut the presumption of the business judgment rule to produce evidence that a director had a non-disclosed, material interest in the challenged transaction and " 'a reasonable [director] would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction.' " *Id.* at 1168 (quoting *Cinerama, Inc. v. Technicolor, Inc.*, Del. Ch., 663 A.2d 1134, 1153 (1994)); *see also Cede II*, 634 A.2d at 362–364.

Fieber argues that Gray's percentage interest in the overall Transactions was so minimal that Gray's interest does not rise to the level of a material interest that would have been considered significant by a reasonable, disinterested director in voting on the Transactions. This contention misconceives the appropriate legal standard.[23]

As *Cinerama* and *Cede II* themselves demonstrate, Gray's interest in the Wallingford and NAF Transactions implicates both the primary rationale for the entire fairness standard of review and the core concern of § 144—"self-dealing." *Cinerama*, Del.Supr., 663 A.2d at 1168–1169. In *Cinerama*, the Supreme Court described self-dealing as existing when "a director deals directly with the corporation, or has a stake in or is an officer or director of a firm that deals with the corporation." *Id.* at 1169 (citing 8 *Del. C.* § 144(a)). "Traditionally, the term 'self-dealing' describes the 'situation when a [corporate fiduciary] is on both sides of a transaction. . . .' " *Id.* (quoting *Sinclair Oil Corp. v. Levien*, Del. Supr., 280 A.2d 717, 720 (1971)).

In *Cede II*, the Supreme Court affirmed Chancellor Allen's holding that *"[a]bsent evidence of self-dealing, . . .* evidence of any personal or special benefit accruing to a director . . . in an otherwise arms-length transaction does not establish a lack of independence sufficient to rebut the business judgment rule unless the director's self-interest is also found to be 'material.' " *Cede II*, 634 A.2d at 362 (emphasis added). In so ruling, the Court noted that the Chancellor had concluded that a "plaintiff's burden of proof of a director's self-interest in an arms-length third party transaction should be *greater* than in a classic self-

the transaction is not approved by a majority consisting of the disinterested directors then the business judgment rule has no applicability in determining demand futility.).

**23.** Fieber's narrower construction of this argument—that Gray's interest is immaterial since it arose after the negotiations were completed—is no more persuasive. Gray expected to participate on the buy-side from the

beginning of the negotiations. It also makes no public policy sense to create an exception to entire fairness review for transactions involving directors who assume conflicted and non-disclosed postures after negotiations on terms are concluded but before the transactions close and receive board approval. Such an exception would invite abuse.

dealing transaction where a director or directors stand on both sides of a transaction." *Id.* (emphasis added); *see also Cede II*, 634 A.2d at 363 ("Provided that the terms of 8 *Del. C.* § 144 are met, self-interest, alone is not a disqualifying factor even for a director."); *Cinerama*, Del. Supr., 663 A.2d at 1169 ("In *Cede II*, this Court distinguished classic self-dealing from incidental director interest. To be disqualifying the nature of the director interest must be substantial.").

■ Gray's undisclosed, buy-side interest in the Transactions is a classic case of self-dealing. Under *Cede II* and *Cinerama*, proof of such *undisclosed self-dealing*, in itself, is sufficient to rebut the presumption of the business judgment rule and invoke entire fairness review. *See also* 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 15.05[1] at 15–11 (1999) (indicating that where classic self-dealing exists the "business judgment rule automatically falls by the wayside").

Section 144 of the Delaware General Corporation Law dictates this conclusion. That statute is implicated whenever a corporation and "1 or more of its directors or officers . . . or partnership . . . or other organization in which 1 or more of its directors or officers . . . have a financial interest" engage in a transaction. 8 *Del. C.* § 144.

The interests of Gray and Fieber in the Wallingford and NAF Transactions trigger the statute. Section 144 provides that a self-dealing transaction will not be "void or voidable solely for this reason" if the transaction is ratified by a majority of the disinterested directors or by a shareholder vote. 8 *Del. C.* § 144(a)(1), (2). Such ratification is valid, however, only if the "material facts as [to the director's] relationship or interest and as to the contract or transaction are disclosed or are known to the [relevant ratifying authority]. . . ." *Id.* Neither Fieber nor Gray disclosed Gray's "interest" in the "[T]ransaction[s]" to the HMG Board. *Id.* In the absence of such disclosure, 8 *Del. C.* § 144(a)(1), the Transactions can only be rendered nonvoidable if they were "fair as to [HMG] as of the time [they were] authorized." [24] 8 *Del. C.* § 144(a)(3); *see also Cede II*, 634 A.2d at 366 n. 34 (under § 144(a)(3), a "non-disclosing interested director can remove the taint of interestedness by proving the entire fairness of the challenged transaction"); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 4.35 at 4–237 (3d ed.1999) (same).

Furthermore, even if the *Cinerama* test to determine whether "an incidental director interest" rose to the level of materiality were applicable, Gray's interest satisfies it. *Cinerama*, Del.Supr., 663 A.2d at 1169. Gray invested $355,000 of his and his sister's money in the Transactions. His keen interest in maximizing distributions from the Joint Venture belies any contention that this investment was not "substantial" and of material importance to him. *Id.* Since Gray anticipated taking a buy-side interest in the Transactions at least as early as February 1986 and was HMG's lead negotiator in the Transactions, a reasonable director would have

---

**24.** While non-compliance with §§ 144(a)(1), (2)'s disclosure requirement by definition triggers fairness review rather than business judgment rule review, the satisfaction of §§ 144(a)(1) or (a)(2) alone does not always have the opposite effect of invoking business judgment rule review that one might presume would flow from a literal application of the statute's terms. *See* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 4.35 at 4–241 (3d ed.1999) (citing & discussing cases); *cf. Kahn v. Lynch Communi-* *cation Sys., Inc.*, Del.Supr., 638 A.2d 1110, 1117 (1994) (subsequent history omitted) (in an interested merger involving a controlling stockholder, approval by an effectively functioning special committee of disinterested directors merely shifts burden so that the plaintiff must prove that the transaction is unfair). Rather, satisfaction of §§ 144(a)(1) or (a)(2) simply protects against invalidation of the transaction "solely" because it is an interested one. *Id.* As such, § 144 is best seen as establishing a floor for board conduct but not a ceiling.

certainly wanted to know about his buy-side position in the Transactions.[25] *See Mills Acquisition Co. v. Macmillan, Inc.* ("*Macmillan II*"), Del.Supr., 559 A.2d 1261, 1279 (1989) (where disinterested majority was manipulated by a deceptive CEO, entire fairness was appropriate standard of review).

Indeed, one of the outside directors who voted to ratify the Transactions testified that he would not have done so had he been aware of Gray's buy-side interest. Tr. 269–270. Wiener gave similar testimony. Tr. 118–119. While I do not base my finding solely on this testimony, I found the testimony of these directors, particularly outside director Walter Arader, a man with extensive experience in matters of corporate governance and a record of distinguished public service, to be credible and to accord with common sense. *Cf. Kendall v. State*, Del.Supr., 726 A.2d 1191, 1193 (1999) (relying on testimony that homebuyers would not have purchased homes from a criminal defendant if the defendant had disclosed his prior misconduct to them in affirming criminal conviction). It supports my conclusion that any reasonable director would want to know about a buy-side interest on the part of a corporate officer and director who acted as a negotiator for the corporation in sales transactions in which the corporation was the seller. The proposition seems almost too obvious to need stating.

For all these reasons, Gray and Fieber must demonstrate the fairness of the Wallingford and NAF Transactions.

### 2. *The Entire Fairness Standard*

In a recent case, Vice Chancellor Lamb well-summarized the entire fairness standard of review as follows:

> It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have 'the

burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.' *Weinberger v. UOP, Inc.* Del.Supr., 457 A.2d 701, 710 (1983) ('There is no 'safe harbor' for such divided loyalties in Delaware.'). Directors will be found to have acted with entire fairness where they 'demonstrate their utmost good faith *and* the most scrupulous inherent fairness of the bargain.' *Id.*

\* \* \* \* \* \*

The concept of entire fairness has two components: fair dealing and fair price. *See Weinberger,* Del.Supr., 457 A.2d at 711. Fair dealing 'embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.' *Id.* Fair price 'relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.' *Id. In making a determination as to the entire fairness of a transaction, the Court does not focus on one component over the other, but examines all aspects of the issue as a whole. Id.*

*Boyer v. Wilmington Materials, Inc.,* Del. Ch., C.A. No. 12549, mem. op. at 32–33, Lamb, V.C., 1999 WL 39549 (Jan. 20, 1999) (emphasis added).

### i. *Fair Dealing*

■ The defendants have failed to convince me that the Wallingford and NAF Transactions were fairly negotiated or ratified. From the beginning of the negotiations, Gray, the primary negotiator for the seller in the Transactions, was interested

---

**25.** Under the approach I believe the business judgment rule and § 144 dictates, the nature of a director's undisclosed, self-dealing interest does not lack legal significance. Rather, the materiality or non-materiality of that interest remains an important factor in determining whether the transaction resulted from a fair process and resulted in a fair price.

in taking a position on the buyer's side.[26] As such, Gray lacked the pure seller-side incentive that should have been applied on behalf of HMG—particularly in Transactions in which one director was already on the other side.

Given the intrinsically unique nature of real estate, the bargaining skills and incentives of HMG's negotiator were likely to be more important than if the negotiator was arranging for the sale of a financial asset. As the defendants' own expert conceded, in the context of a real estate sales transaction negotiation skills are "exceedingly important." Tr. 970.

Gray took the lead in discussing these Transactions with the Fiebers. His colleagues Wiener and Rothstein relied on his depiction of the bargaining in determining whether to agree to the Fiebers' proposed terms. They did so in ignorance of Gray's conflict. Similarly, HMG's Executive Committee and Board were deprived of information about Gray's conflict.

The process was thus anything but fair. Because neither Gray nor Fieber disclosed Gray's interest, the HMG Board unwittingly ratified Transactions in which a conflicted negotiator was relied upon by the Adviser to negotiate already conflicted Transactions. *Cf. Cinerama*, Del.Supr.,

663 A.2d at 1173 ("The independence of the bargaining parties is a well-recognized touchstone of fair dealing.").

### ii. *Fair Price*

The defendants attempt to meet their burden of demonstrating fair price by trying to convince me that the prices used in the Transactions were in a range of fairness, as proven by the 1984 Appraisals. In addition, they cite to portions of HMG's own 10–Ks, which continue to report that the Transactions were conducted on terms tied to appraisals and as favorable as if they had been done at arms-length with an unrelated purchaser.[27]

■ Once again, I believe the defendants misconceive their burden. On the record before me, I obviously cannot conclude that HMG received a shockingly low price in the Transactions or that the prices paid were not within the low end of the range of possible prices that might have been paid in negotiated arms-length deals. In that narrow sense, the defendants have proven that the price was "fair." But that proof does not necessarily satisfy their burden under the entire fairness standard. As the American Law Institute corporate governance principles point out:

> A contract price might be fair in the sense that it corresponds to market

---

**26.** The abundant documentary evidence relevant to the Transactions which bears Gray's fingerprints is striking in comparison to the absence of documents demonstrating Wiener's close involvement. While Gray and Fieber acknowledge that Gray was involved in negotiating the Transactions with Fieber, including participating in discussions regarding price, tr. 440–442, 1207; Gray 285–286, they assert that Gray's negotiating authority was limited and that Gray simply acted as a "go-between" for Wiener. Tr. 1071–1072. In this regard, they make much of the fact that there is not concrete evidence that Gray *negotiated*, as opposed to *discussed*, price during his many conversations with the Fiebers regarding the Transactions. I do not draw the same inferences they do from this fact. For one thing, how can HMG prove what occurred in oral conversations between Gray and the Fiebers? Their self-serving denials of negotiations are hardly persuasive. Most important, the absence of real negotiations be-

tween Gray and Fieber, if true, does not weaken HMG's case, it strengthens it. I credit Wiener's and Rothstein's testimony that Gray was supposed to have been negotiating for the best price and that he led them to believe that he did so.

**27.** I place little weight on this admittedly awkward (for HMG) fact. The 10–Ks also disclose that the HMG Board regards the Transactions as tainted and is pursuing this lawsuit to obtain a remedy. Nor do I find convincing the defendants' argument that the price had to be fair because HMG paid Transco the same proportionate price as the Fieber investors paid HMG in the Transactions. I place no weight on the Transco factor since they were "one pair of pants with two pockets." If Transco has an interest in any recompense from HMG, that is a matter between it and HMG.

price, and yet the corporation might have refused to make the contract if a given material fact had been disclosed.... Furthermore, fairness is often a range, rather than a point, so that a transaction involving a payment by the corporation may be fair even though it is consummated at the high end of the range. *If an undisclosed material fact had been disclosed, however, the corporation might have declined to transact at that high price, or might have bargained the price down lower in the range.*

1 *Principles of Corporate Governance; Analysis and Recommendations* Part V at 202 (1994) (emphasis added); *but see Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., 663 A.2d 1134, 1143 (1994) (subsequent history omitted) (*"at least in the non-self-dealing context,"* price within a range of values a reasonable seller would accept is "fair") (emphasis added).

The defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage. I base this conclusion on several factors.

First, the defendants' own expert on value, James Nolan, testified that his opinion that the prices paid in the Transactions were fair was premised on his assumption that Gray was not the leading negotiator from HMG's side. To the extent that Gray was a principal player in discussing terms with Fieber, Nolan said that his conclusion about the fairness of the price might well be different. Tr. 972–973.[28]

Second, the 1984 Appraisals understated the values of the Wallingford Property and the Portfolio as of early 1986. The Leased Fee Values in the 1984 Appraisals were generated through a discounted cash flow analysis utilizing 1983 actual rents and projected rents for 1984–1986. By 1986, it was clear that the Grossman's stores operating at Portfolio sites were performing better, and thereby generating higher lease payments (because a portion of the lease payments was tied to store sales) than estimated by the appraisers who conducted the 1984 Appraisals. PX 396, 397; Lavin 258. If an update had been done in 1986, it would have produced values well in excess of the 1984 Appraisals. This conclusion is bolstered by appraisals done on six of the Portfolio properties in 1987 at the request of Chemical Bank, which selected the properties to be appraised. The 1987 appraisals indicated values 66% higher than the Leased Fee Values in the 1984 Appraisals. PX 396 (also indicating a 64.5% increase in the Fee Simple Values); Tr. 656–659; Lavin 260–262.[29]

---

**28.** Nolan is not a certified appraiser but has extensive experience in the real estate field so I decided to consider his testimony despite a credible challenge to his credentials mounted by HMG. Nolan did not perform a formal valuation of the affected properties as of 1986. While I believe Nolan sincerely attempted to give his honest opinion about the financial fairness of the Transactions, his rather unique "role playing" approach was heavily dependent on assumptions he made about the motivations and roles of the humans involved. *See, e.g.,* Tr. 955. Since those assumptions do not comport with my view of the evidence, I give little weight to his testimony.

**29.** The parties invested a great deal of energy in briefing the admissibility of the deposition testimony and hearsay statements of Jim Lavin (proffered through Jim Fieber at trial), the long-standing property manager for the Portfolio, regarding the propriety of using the 1984 Appraisals to set the Transaction values in 1986. For the purposes of this opinion, I will somewhat charitably assume, *see* Lavin 46–47, the defendants' view that Lavin had the authority as property manager for SBA in 1986 to speak about value on HMG's behalf so to permit the introduction of his alleged statement to Jim Fieber. D.U.R.E. 801(d)(2)(c). I will also assume that his deposition testimony is admissible under Chancery Court Rule 32(a)(4) and/or under D.U.R.E. 801(d)(2)(c) because Lavin somehow continues to be HMG's agent even though he now works for the Joint Venture. Even so, Lavin's testimony does not materially aid the defendants. Read as a whole, Lavin's testimony

Third, a skilled and properly motivated negotiator could have done better than Leased Fee Value in price negotiations. As the defendants' expert Nolan testified, the skills of a negotiator are "exceedingly important" in a real estate transaction. Tr. 970. Even without an updated appraisal, a properly motivated negotiator could have argued from the actual rents in 1984 and 1985 that the Leased Fee Value understated the value of the Portfolio. Furthermore, a properly motivated negotiator would have focussed on the Fee Simple Value because of the likelihood that many of the Portfolio properties would come off lease from Grossman's. That eventuality—which came true—justified a higher price than the Leased Fee Value. I have no confidence that Gray negotiated with the Fiebers in any vigorous or skillful way. Since he wanted to participate on the buy-side, he had less than a satisfactory incentive to do so. Since the outcome of a real estate negotiation is often heavily influenced by the skills of the negotiators, this factor undercuts the claim that the price was fair to HMG. *See* 1 *Principles of Corporate Governance: Analysis and Recommendations* § 5.02 at 220 (1994) (in evaluating the fairness of a transaction, the court should consider the fact that the corporation was not represented by an unconflicted negotiator).

Finally, had Gray disclosed his interest, I believe that HMG would have terminated his involvement in the negotiations and have taken a much more traditional approach to selling the affected properties. Tr. 95. To the extent that HMG continued to consider a sales transaction, I believe it would have commissioned new appraisals and would have sought purchasers other than Fieber. This would have been in keeping with the recommendations of Lavin's January 1986 memorandum suggesting rejection of the $300,000 third-party

reflects the position that the 1984 Appraisals understated the value of the Portfolio and Wallingford in 1986, *e.g.*, Lavin 260–262, as does his contemporaneous advice that SBA should update the relevant Appraisal before

offer for Wallingford. PX 36A. Such an approach would have led to a sales transaction at a level more akin to the Fee Simple Value in the 1984 Appraisals than the Leased Fee Value. *Cf. Cede II*, 634 A.2d at 361 (where directors sell the company they must establish "that the price offered was the highest value reasonably available under the circumstances").

Taken together, these factors lead me to conclude that the defendants have not demonstrated that they paid a fair price in the sense inherent in the entire fairness standard. *See Cinerama*, Del.Ch., 663 A.2d at 1140 ("Th[e] judgment concerning 'fairness' will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case. 'Fairness' simply is not a term with an objective referent or clear single meaning."). Therefore, Gray and Fieber have failed to establish to my "satisfaction that the [T]ransaction[s] [were] the product of both fair dealing *and* fair price." *Cinerama*, Del.Supr., 663 A.2d at 1179 (quotations & citations omitted) (emphasis added).

### B. *Fraud*

■ To prevail on its claim of fraud against Gray and Norman Fieber, HMG must prove:

1) Deliberate concealment by [Gray and Fieber] of a material past or present fact, or silence in the face of a duty to speak;

2) That [Gray and Fieber] acted with scienter;

3) An intent to induce [HMG's] reliance upon the concealment;

4) Causation; and

5) Damages resulting from the concealment.

selling Wallingford. PX 36A. Moreover, Lavin vehemently disclaimed any expert status regarding the Portfolio properties' values when the defendants tried to obtain his testimony in such capacity.

*Nicolet, Inc. v. Nutt,* Del.Supr., 525 A.2d 146, 149 (1987); *Stephenson v. Capano Dev., Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983). Equitable fraud has the same elements, but there is no scienter requirement. *Zirn v. VLI Corp.,* Del.Supr., 681 A.2d 1050, 1061 (1996).

▮ As directors of HMG, Gray and Fieber had an "unremitting obligation" to deal candidly with their fellow directors. *Macmillan II,* 559 A.2d at 1283. This obligation required them to take affirmative steps to disclose Gray's interest. *Id.;* see also 1 *Principles of Corporate Governance; Analysis & Recommendations* § 5.02 at 215 (1994) (interested director must "affirmatively disclose the material facts known to the director" and "explain the implications of a transaction").

Applying these standards, I have no hesitance in finding that Gray:

Deliberately concealed his personal interest in the Transactions and was silent in the face of a duty to disclose that interest to his fellow HMG directors;

Acted with the requisite scienter;

Intended for the HMG Board to rely on his concealment in approving the Transactions;

Caused the HMG Board to approve the Transactions, when they would not have done so had he made the appropriate disclosures;

Damaged HMG by thereby facilitating the Transactions at prices substantially less than HMG would have obtained had the affected properties been sold through a different process.

As such, he is liable to HMG for fraud. *Macmillan II,* 559 A.2d at 1283 (where directors' silence was "misleading and deceptive" they committed "a fraud on the board"). Furthermore, Gray's fraudulent concealment continued for ten years after 1986.

▮ I reach the same conclusion with regard to Norman Fieber, with only slight-

ly more hesitation as to whether he acted with scienter.[30] Although Gray is more culpable than Norman Fieber, Norman Fieber's self-portrayal as a babe in the business woods is not convincing to me. Fieber is a successful and savvy man.

▮ At the time the HMG Board of Directors ratified the Transactions, Fieber admittedly knew that members of Gray's family owned Martine. As a director of HMG who was a proponent of the Transactions, Fieber had a duty to disclose what he knew about Martine, even if Gray did not.

In this regard, I profess that I cannot grasp the enormous significance Fieber places on the fact that he thought that Gray's family, rather than Gray personally, owned Martine. Fieber is a man who says he has often represented members of his family in financial transactions. Tr. 397, 1128. When he does so, I have no doubt that Fieber attempts to protect his family members' financial interests no less avidly than he attempts to protect his own. Nor do I have any doubt that Fieber believed that Gray was equally protective of his own mother and sister, the members of Gray's family the Fiebers say they thought owned Martine. Tr. 359.

Fieber therefore knew that Gray had an interest in ensuring that the price paid by Martine was favorable to members of Gray's family. Fieber possessed knowledge that Gray had a conflicted interest in the Transactions since this buy-side interest was adverse to HMG's sell-side interest. He had a duty to disclose his knowledge.

If it is true that Gray told Fieber in February 1986 that Martine could invest in the Transactions, but that Gray could not invest personally, that conversation alone would have set off a fire alarm in the mind of a reasonable director. At that stage, Fieber should have brought the issue to the attention of the Board's Chairman Wiener, if not to all of his fellow directors.

---

**30.** There is no question that Fieber committed equitable fraud.

Instead, Fieber continued to negotiate these important Transactions with Gray knowing that Gray's family partnership wanted to participate on the buy-side of the deals.

Fieber's contention that he never thought he had to disclose his knowledge of the interest of Gray's family is unbelievable. I think he took his cue from Gray and purposely kept quiet so that the Transactions would be ratified.

■ Fieber's post-ratification silence also constituted fraud. No later than November 1986, Fieber received clear notice that Gray was a partner in Martine. PX 138. At that time, he could have partially rectified his earlier failure to speak by bringing Gray's partnership status to the attention of the HMG Board. This he failed to do. Nor did he bring Gray's partnership status to the attention of the HMG Board when he received additional evidence of Gray's status.

Fieber answered questionnaires every year in which he claimed to have no knowledge of transactions between HMG and Gray. Fieber's claim that he did not disclose Gray's interest at the August 1986 Board meeting because he then believed that Martine was owned by Gray's family cannot excuse his later failure to disclose Martine in response to company questionnaires clearly requiring such disclosure.

Nor do I find persuasive Fieber's claim that he was confused by the questionnaires. Norman Fieber is a sophisticated man who can read the English language. The questionnaires are not that difficult to read. A properly motivated fiduciary would err on the side of over-disclosure, not under-disclosure. In this respect, I find significant the absence of any evidence that Fieber called up company counsel and said, "You know, I'm not sure but I think Lee Gray might be a partner in Martine since I got a letter from him that says so. In any case, I know for sure that members of Lee Gray's family own Martine and Martine has a stake in the Wall-

ingford and NAF Transactions. Is that the kind of thing that I need to put down under question 3(a)?" It is, frankly, hard for me to swallow a defense implicitly premised on the assertion that a director and member of the audit committee of a public company took lightly questionnaires the company required in connection with preparing disclosures under the federal securities laws.

### C. *Aiding and Abetting*

■ To prevail on its claim that Saffell aided and abetted Gray's breach of fiduciary duty, HMG must show: 1) the existence of a fiduciary relationship; 2) a breach of the fiduciary's duty; 3) knowing participation by the non-fiduciary in that breach; and 4) resulting damages. *In re Santa Fe Pac. Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 72 (1995). Since Gray was an HMG fiduciary, breached his duty, and caused resulting damages, the only element in question is whether Saffell knowingly participated in that breach.

Saffell played a major role in concealing Gray's ownership interest in Martine from HMG. By authorizing Jim Fieber to sign the NAF partnership agreement, she obviated the need for either herself or Gray to sign the agreement. Had either done so, the chances that HMG would have learned that the two of them owned Martine would have increased exponentially.

Saffell testified that she essentially entrusted her business affairs to her brother, Gray, who had taken care of her finances since she was widowed early in her adult life. I found her testimony to be credible and believe that she would have been likely to assent to any reasonable request made to her by Gray in connection with Martine.

This is not to say that Saffell was a helpless ingenue. There is no doubt that Saffell knew that Martine was investing in the NAF Transaction and that it was a substantial investment. PX 367A. Nor was it typical for Saffell to be asked by Gray to sign anything on behalf of Mar-

tine, much less an authorization allowing another person to act as Martine's agent. I am sure that Saffell, an intelligent person who had a career as a school teacher, realized something odd was up.

Even so, HMG has not persuaded me that Saffell authorized Jim Fieber to sign that agreement with the knowledge that by doing so she was assisting her brother in covering up their ownership interest in Martine. As such, she is not liable as an aider and abettor.[31] *See Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, 1995 WL 694397, at * 15 n. 11, Allen, C. (Nov. 21, 1995) (aiding and abetting claim must be supported by proof of an understanding between the parties "with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties").

 The fact that Saffell was not an aider and abettor does not, however, insulate her from being responsible to HMG for recompense. Saffell's liability is justifiable on at least two independent grounds. As a former general partner in Martine, Saffell is liable for the authorized acts of her brother on behalf of the partnership. *Restatement (Second) of Agency* § 14A cmt. a (1958). Under New York law, which governed Martine, Saffell is liable even if she had no knowledge of her brother's wrongdoing. *Clients' Sec. Fund of State of New York v. Grandeau,* 72 N.Y.2d 62, 530 N.Y.S.2d 775, 526 N.E.2d 270, 273 (1988); *see also* 15A *N.Y. Jur. Business Relationships* § 1474 (1998). Saffell is also properly held accountable because she was unjustly enriched at HMG's expense. Although she herself may have been innocent, her agent Gray was not and wrongfully obtained profits for Martine at the expense of HMG. It is

appropriate to require Saffell to make restitution even if she was "not a wrongdoer," since it would be "unconscionable" to allow her to benefit from her agent's wrongful activity on her behalf. *Schock v. Nash,* Del.Supr., 732 A.2d 217, 232 (1999).

### D. *Fieber's 8 Del. C. § 102(b)(7) Defense*

 Before discussing the appropriate remedy, I must address Norman Fieber's claim that he, at most, breached the duty of care he owed to HMG and therefore that he is insulated under the relevant provision of HMG's certificate of incorporation, which tracks 8 *Del. C.* § 102(b)(7).

For at least two reasons this defense fails. First, § 102(b)(7) does not allow certificate provisions to "eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective." As Fieber belatedly concedes, the relevant HMG certificate provision was not effective until August 17, 1987, after the major acts upon which Fieber's liability hinges occurred. DX 203.

Second, Fieber's concealment of the facts about Martine implicates his duty of loyalty, not just his duty of care. Fieber knew that he was negotiating already conflicted Transactions. Yet, he chose to negotiate those Transactions with a fellow director who desired to participate with him on the buy-side of the deals. Thereafter, Fieber invited that director's participation on the buy-side. Having done so, Fieber continued to conceal that director's interest in the Transactions. This conduct was not the product of mere inadvertence, but a conscious decision by Fieber not to come clean with the Board.[32]

---

**31.** Similarly, I am not persuaded that Saffell "conspired" with Gray to defraud or otherwise harm HMG.

**32.** I would also note that to the extent that Fieber had simply violated his duty of care and to the extent HMG's exculpatory charter provision was potentially applicable,

§ 102(b)(7) seems to contemplate liability for a director who personally benefits from his own gross negligence. In such a situation, § 102(b)(7)(iv) appears to preclude an exculpatory charter provision from limiting the director's liability. *But see Rothenberg v. Santa Fe Pac. Corp.,* Del.Ch., C.A. No. 11749, 1992 WL 111206, at *6, Jacobs, V.C. (May 18,

### III. *What Is The Appropriate Remedy?*

#### A. *Damages and Injunctive Relief*

 As one would expect, the parties part ways on the nature of the remedy that should be awarded. HMG argues that Gray and Fieber have behaved so improperly that an award of rescissory damages should be made that requires Gray and Fieber to restore to HMG the profits earned by all of the buy-side investors in both Transactions. HMG urges such a remedy because rescission itself is not a practical remedy since several of the Fieber-side investors in the Transactions are not parties to this action. HMG also wants me to order Gray and Fieber to disgorge their remaining ownership interests in the Joint Venture and to impose a constructive trust on the remaining assets of the Joint Venture. To the extent that Gray and Fieber cannot cause the non-party NAF investors to transfer their ownership interests in the Joint Venture to HMG, HMG seeks to hold Gray and Fieber jointly and severally liable to pay their future share of the profits to HMG.

For their part, Gray and Fieber argue that no harm to HMG occurred at all. Realizing that I might find otherwise, they argue alternatively that a judgment requiring Gray and Fieber to pay complete rescissory damages, to disgorge their remaining ownership interests in the Joint Venture, and to be accountable for their co-investors' future profits is too harsh an award given the circumstances.

I have given a great deal of thought to the appropriate remedy. There is no doubt that Gray and Fieber committed serious breaches of duty and that the remedy sought by HMG is permissible in these circumstances. *Ryan v. Tad's Enter., Inc.*, Del.Ch., 709 A.2d 682, 698, *aff'd*, Del.Supr., 693 A.2d 1082 (1997) ("[A]n award of rescissory damages would be most appropriate where it is shown that the defendant fiduciaries unjustly enriched themselves by exercising their fiduciary authority deliberately to extract a personal financial benefit at the expense of the corporation's shareholders."). I am mindful of the need to tailor a remedy that holds them accountable for those breaches and that does not set a precedent that encourages behavior of this sort by other directors of Delaware companies. "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe v. CERBCO, Inc.*, Del.Supr., 676 A.2d 436, 445 (1996).

On the other hand, it is likely that HMG would have sold a percentage interest in the Grossman's Portfolio to a buyer other than Fieber sometime in 1986 or 1987 if it had not sold such an interest to Fieber. The evidence persuades me that HMG was looking to generate cash and the Portfolio was a prime candidate in that regard. Had HMG sold a percentage interest in the Portfolio at that time, it would have sought a price near the Fee Simple Value in the 1984 Appraisals and would have been quite happy to receive such a price.

Therefore, if I order Gray and Fieber to return all the profits earned by the buy-side members of the Joint Venture, I will be putting HMG in a position much better than I think it would be in now had the Transactions never occurred. I will also be requiring Gray and Fieber, who are affluent but not without resource limits, to pay a judgment that seems out of proportion to the harm they caused. I do not think such an award is equitable.

Instead, I have crafted a remedy tailored to the specific facts of this case. In so doing, I have done my best to "craft from the 'panoply of equitable remedies' a damage award that approximates a price [and terms] the [HMG] board would have

1992) (indicating that § 102(b)(7)(iv) is "plainly directed to violations of obligations other than the duty of care"). That subsection states that a corporation may not limit a director's liability "for any transaction from which the director derived an improper benefit."

approved absent a breach of duty." *Ryan,* 709 A.2d at 699.

Several principles guide me in shaping this remedy. First, I think it is likely that HMG would have obtained a price at the Fee Simple Value had the Transactions been negotiated on an arms-length basis. Second, Gray should never have had any ownership interest on the buy-side of the Transactions. Third, I think that HMG would have been able to sell somewhat less than the percentage interest it sold to the Fieber-side investors in the NAF Transaction had that Transaction been negotiated on an arms-length basis. Finally, it is inequitable to permit Norman Fieber to continue to exercise co-equal control over the Joint Venture.

In keeping with the first principle, Gray and Fieber will be held jointly and severally liable to pay HMG the difference between the Fee Simple Value and the price actually paid by the buyers other than Martine in the Wallingford and NAF Transactions. The difference will be based on a calculation that assumes that the buyers paid for an interest proportionate to the interest actually purchased minus Martine's attributed percentage interest. In keeping with the second and third principles and in light of Gray's egregious conduct, Gray and Saffell, as Martine's former general partners, shall transfer their respective ownership interests in NAF Associates to HMG. Gray, Saffell, and Fieber shall also be jointly and severally liable to HMG for the distributions Martine has thus far received from the Wallingford and NAF Transactions, net of Martine's investment cost.[33]

Because my approach is different than that taken by any of the parties, the parties shall confer and attempt to present an order quantifying the award under the criteria outlined in the preceding paragraph within three weeks of this opinion. That quantification should be brought to present value in accordance with the following reasoning. At trial, HMG's damages expert, Anthony B. Creamer of Arthur Andersen & Company, calculated the present value of profits paid to the Fieber-side investors using two indices developed by the National Council of Real Estate Fiduciaries ("NACREF"). The first index measures the total annual performance of real estate investments in the Eastern United States, without specification as to the type of real estate. The second index measures the total annual performance of investments in retail properties in the United States as a whole. Creamer's quite sensible rationale was that HMG was a REIT and thus the loss of its time value in money should reflect its status as a company that makes real estate investments, rather than passbook savings account deposits. In calculating the rescissory damages advocated by his client, Creamer gave the Fieber-side investors credit for their investment costs, but applied the consumer price index to bring those costs to present value. I believe that the same index should be applied to both the investment costs and profits relevant to the award. The Fieber-side investors were also likely to have invested in real estate or alternative investments (e.g., equities) with a larger annual return than the inflation rate. Although the indices are not markedly different, it makes more sense to me to use the NACREF index tracking investments in retail properties since that was the type of real estate investment at issue in the Transactions. *See Summa Corp. v. Trans World Airlines, Inc.,* Del.Supr., 540 A.2d 403, 409, *cert. denied,* 488 U.S. 853, 109 S.Ct. 140, 102 L.Ed.2d 112 (1988) (Court of Chancery has "broad discretion, subject to principles of

**33.** While Fieber should be liable to HMG for this portion of the relief awarded, I note my view that Gray and Saffell are primarily responsible for this portion of the judgment and that Fieber should have a meritorious claim for indemnity or contribution against them in the event that he must pay any or all of this portion of the judgment to HMG in the first instance.

fairness in fixing the [pre-judgment interest] rate to be applied.").

■ In keeping with the third principle, I will enter an order that will disable Norman Fieber from controlling in any manner the future operation of the Joint Venture. Unfortunately, the voluminous record does not contain all of the relevant Joint Venture agreements necessary to determine exactly how to accomplish this result. Rather than shoot in the dark, I direct the parties to confer on a method to accomplish this part of the remedy and to report to me regarding this issue at the same time as they present their views on the damages quantification.[34] This order is less extreme than a rescission order that would require Norman Fieber to transfer his complete ownership interest in the Joint Venture to HMG and thereby his right to share in future profits. To the extent that such a partial transfer is not practicable, I will be inclined to order a full transfer of Norman Fieber's ownership rights to ensure that he exercises no managerial control over the Joint Venture in the future.

Lastly, the parties should confer and present me with their respective positions regarding the propriety of applying post-judgment interest to the entire amount of the Award. See Stone & Co., Inc. v. Silverstein, Del.Supr., C.A. No. 298, 1998, Walsh, J. (Apr. 1, 1999) (ORDER). To that end, the parties shall quantify the difference between the award unadjusted by the NACREF index and as thereby adjusted.

Taken as a package, this remedy makes HMG whole for the damages caused by the breaches of fiduciary duty and fraud committed by Gray and Fieber and holds Gray and Fieber properly accountable for their serious misconduct.

### B. Are The Defendants Liable For HMG's Attorneys' Fees?

The so-called "American Rule" requires that prevailing litigants ordinarily bear their own attorneys' fees and expenses. Two exceptions to the American Rule are, according to HMG, applicable here. These exceptions permit an award of attorneys' fees as an element of damages if a prevailing party demonstrates that the losing defendants: i) engaged in bad faith conduct that increased the costs of the litigation; or ii) engaged in pre-litigation conduct of a sufficiently egregious nature.[35] Arbitrium (Cayman Islands) Handels AG v. Johnston, Del.Ch., 705 A.2d 225, 231 (1997), aff'd, Del.Supr., 720 A.2d 542 (1998).

■ The mere fact that a corporate director has breached his duty of loyalty to the corporation does not justify an award of attorneys' fees and expenses under the latter exception. This exception to the American rule is "narrow" and should be applied "'in only the most egregious instances of fraud or overreaching.'" Boyer v. Wilmington Materials, Inc., Del. Ch., C.A. No. 12549, 1999 WL 342326, mem. op. at 10, Lamb, V.C. (May 17, 1999) (quoting

---

**34.** One possible remedy might be an order requiring Norman Fieber to transfer his voting rights in NAF Associates and the Joint Venture (under the appropriate agreements) to HMG.

**35.** HMG reads Thorpe v. CERBCO, Inc., Del. Supr., 676 A.2d 436, 445 (1996) as having modified and broadened this exception so that any investigative and litigation costs incurred by a corporation to prosecute a breach of loyalty case against its directors are automatically recoverable. This is a misreading. Thorpe simply required defendant directors who pursued a corporate opportunity for themselves to reimburse the corporation for outside counsel fees the corporation incurred to obtain advice for a special committee of outside directors regarding the self-interested transaction the defendants proposed because such fees were "made necessary by the course of events initiated by the [defendants'] breach." Thorpe v. Cerbco, Inc., Del.Ch., C.A. No. 11713, 1996 WL 560173, at *2, Allen, C. (Sept. 13, 1996) (interpreting Supreme Court mandate on remand). The Court's ruling did not thereby eliminate the American Rule in all successful breach of fiduciary duty cases brought by corporations against directors.

*Arbitrium,* 705 A.2d at 231). "Otherwise, every adjudicated breach of fiduciary duty would automatically result in a fee award." *Ryan,* 709 A.2d at 706.

■ Applying this stringent standard, I find that Gray should be responsible to HMG for an appropriate award of attorneys' fees and expenses. His intentional, bad faith misconduct prior to the litigation was "totally unjustified," *Weinberger v. UOP, Inc.,* Del.Ch., 517 A.2d 653, 656 (1986), and rises to the level of egregiousness necessary to justify such an award.

Gray's conduct in this litigation has also made the litigation far more expensive than was necessary. HMG was forced to litigate two successful motions to compel in order to obtain full document discovery from him. Gray even put the court through a charade early in the litigation. At that time, Martine was a defendant because HMG had no idea that Gray had dissolved it. Gray even verified and signed court filings that indicated that Martine still existed. Indeed, this court decided a motion on December 11, 1997 regarding whether personal jurisdiction could be exercised over Martine. After all these events, HMG learned of Martine's dissolution through third-party discovery taken from Gray's personal accountant. Gray 36–46. It was only then that Gray came clean and told HMG and the court that Martine had been dissolved before the start of the litigation. *See* Dkt. 104. Thus, Gray's conduct, both before and during litigation, justifies an award of fees and expenses.

■ Unlike Gray, Fieber's conduct does not rise to the level of egregiousness required to sustain an award of attorneys' fees. Although Fieber's misconduct was serious, Fieber is not as culpable as Gray. Gray's long-standing affiliation with HMG, his role as President of the company, his much more substantial experience serving as a director of public companies, and his active efforts to cover up his own owner-ship interest support this conclusion. Fieber, although deserving of blame, is less sophisticated about corporate governance issues and is generally not as careful and meticulous a businessperson as Gray. He also seems to be a person inclined to place trust in long-standing friends, including Gray, and thus likely to take his lead from them in situations—like this—where they seemed to possess the superior understanding of what was acceptable behavior.

The final judgment I will enter will therefore assess reasonable attorneys' fees and expenses solely against Gray. The amount of such award shall be half of HMG's total fees and expenses left after Gray pays fully for the costs incurred by HMG in connection with: i) its successful motions to compel; and ii) Gray's failure to promptly disclose the fact that Martine had been dissolved prior to the litigation. Since I have exercised my discretion to award attorneys' fees against Gray at a level substantially less than the full award HMG sought, I hope that Gray will not burden HMG or the court with extensive nitpicking regarding the amount of HMG's fees. In that regard, I direct Gray and HMG to attempt to agree upon the specific amount of such fees and expenses and, if they are unable to do so, to report to me on their respective positions in three weeks. To the extent that the parties do not reach agreement, I will determine an appropriate amount based on the reports and the existing briefing in connection with HMG's motion for attorneys' fees under Chancery Court Rule 37 as a result of HMG's two successful motions to compel.

### IV.

For the foregoing reasons, judgment shall be entered for HMG against defendants Gray, Fieber, and Saffell. The parties shall report back to me in three

weeks. If an agreed upon order is not presented, each party shall submit its position regarding the outstanding issues and an accompanying form of order.[36]

So Ordered.

---

**36.** For obvious reasons, the defendants' Rule 41(b) motions are also hereby denied. It Is