WADDELL & REED FINANCIAL, INC., Waddell & Reed, Inc., and Waddell & Reed Investment Management Company, Plaintiffs,

v.

TORCHMARK CORPORATION, Ronald K. Richey, Harold T. McCormick, and Louis T. Hagopian, Defendants.

Civ.A. No. 01–2372–KHV.

United States District Court, D. Kansas.

Sept. 28, 2004.

James D. Griffin, Stephen J. Torline, Blackwell Sanders Peper Martin LLP, Kansas City, MO, L. Steven Grasz, Megan Sebastian Wright, Nicole T. Bock, Thomas H. Dahlk, Trenten P. Bausch, Blackwell Sanders Peper Martin LLP, Omaha, NE, for Plaintiffs.

Betsy Palmer Collins, Alston & Bird, Atlanta, GA, Brenda Ranee Mesker, Matthew C. Miller, Scott C. Nehrbass, William R. Sampson, Shook, Hardy & Bacon L.L.P., Overland Park, KS, Hobart A. McWhorter, Jr., James W. Gewin, Michael R. Pennington, Bradley Arant Rose & White LLP, William J. Baxley, Baxley, Dillard, Dauphin & McKnight, Birmingham, AL, for Defendants.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Waddell & Reed Financial, Inc. ("W & R Financial"), Waddell & Reed, Inc. ("W & R") and Waddell & Reed Investment Management Company ("W & R Investment") filed suit against Torchmark Corporation ("Torchmark") and Ronald K. Richey, Harold T. McCormick and Louis T. Hagopian. Torchmark is the former corporate parent of W & R Financial, W & R and W & R Investment, and the individual defendants were common directors of Torchmark and W & R Financial. Plaintiffs initially sought to recover under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and asserted Kansas common law claims for breach of fiduciary duty, knowing participation in breach of fiduciary duty and fraud through silence. The Court granted summary judgment in favor of defendants on some of plaintiffs' claims.[1] The follow-

---

**1.** *See Memorandum And Order* (Doc. # 461) filed August 20, 2004 (granting summary judgment in favor of defendants on (1) the

ing claims remained for trial: (1) the claim of W & R Financial against McCormick and Hagopian for breach of fiduciary duty, and (2) the claim of W & R against McCormick and Hagopian for fraud by silence. The claim of W & R for fraud by silence was tried to a jury. The Court had previously ruled that W & R Financial could not prove any damages on its breach of fiduciary duty claim. The parties therefore agreed to try that claim to the Court.[2] On

September 9, 2004, the jury returned a verdict in favor of defendants on the fraud by silence claim by W & R. *See Verdict* (Doc. # 508). Having considered the evidence submitted at trial on the fiduciary duty claim of W & R Financial, the Court finds that defendants are entitled to judgment. The Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

RICO claim of W & R Financial, W & R and W & R Investment against all defendants; (2) the fraud by silence claim of W & R against Richey; (3) the damage claims of W & R Financial for the fees and costs incurred in the Alabama litigation, the California litigation and the NASD investigation, and the punitive damages awarded in the Alabama litigation; and (4) the damage claim of W & R for punitive damages awarded in the Alabama litigation); *Memorandum And Order* (Doc. # 79) filed February 4, 2003 (granting summary judgment in favor of Torchmark on claim of knowing participation in breach of fiduciary duty).

2. Immediately prior to trial, plaintiffs' counsel announced that W & R Financial "would be willing to have the Court make a determination on liability" on its fiduciary duty claim. *See* Trial Transcript at 4. The Court asked the parties whether they would stipulate that if a jury found defendants liable for fraud, that finding would be a sufficient basis to enter judgment in favor of W & R Financial for one dollar nominal damages on its fiduciary duty claim. *See id.* at 6. Counsel for defendants and plaintiffs agreed to so stipulate. *See id.*

Defendants argue that (1) the Court cannot find that defendants breached their fiduciary duty to W & R Financial because the jury found that they did not commit fraud by silence; and (2) defendants never waived their right to a jury trial on the fiduciary duty claim. The Court disagrees with both of defendants' positions.

First, the point of the stipulation was that the Court would enter judgment for nominal damages for breach of fiduciary duty if the jury determined that defendants were liable for fraud. The Court requested the stipulation to avoid any delay occasioned by a need

to prepare factual findings and legal conclusions on the fiduciary duty claim—especially since a finding of fraud would appear to foreclose any finding that defendants did not breach their fiduciary duty of loyalty to W & R Financial.

Second, when plaintiffs' counsel specifically advised that he was willing to have the Court determine liability on the fiduciary duty claim, defendants did not object. *See id.* at 4–6. The Court and counsel did not stipulate, or even discuss, how the Court would dispose of the fiduciary duty claim if the jury exonerated defendants on the fraud claim. In light of the exchange between counsel and the Court, however, it was obvious that the Court would determine liability on the fiduciary duty claim. Under defendants' argument, the Court would enter judgment for nominal damages for breach of fiduciary duty, in accordance with the parties' stipulation, if the jury held that defendants had committed fraud; otherwise, the claim would indefinitely remain in limbo. Such a procedure could not produce a final judgment, however, and it would require the Court to certify for interlocutory appeal all remaining claims and issues in the case. *See* Fed.R.Civ.P. 54(b) (final judgment rule); 28 U.S.C. § 1292(b) (appeals of interlocutory orders); *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1252–53 (10th Cir. 1998) (parties may not confer appellate jurisdiction as to claims dismissed on merits by voluntarily dismissing remaining claims without prejudice); *Heimann v. Snead*, 133 F.3d 767, 769 (10th Cir.1998) (same). If defendants truly advocated such a procedure, their able counsel should have so advised the Court. Moreover, given the relatively narrow scope of the liability issue on the fiduciary duty claim, the Court would have rejected any attempt to hold that issue in abeyance pending appeal on all other issues in the case.

### Findings Of Fact

W & R Financial alleges that McCormick and Hagopian breached their fiduciary duties as members of its board of directors by not disclosing to other board members that Torchmark viewed the letter of July 8, 1999 as something other than a final agreement. *See Pretrial Order* (Doc. # 390) at 5.[3] The Court has previously set forth the factual background of this case. *See Memorandum And Order* (Doc. # 461). Here, the Court includes only those findings of fact which are relevant to the fiduciary duty claim of W & R Financial against McCormick and Hagopian.

Before March of 1998, Torchmark directly or indirectly owned W & R Financial, W & R and UILIC. After Torchmark spun off W & R Financial and its subsidiaries, W & R Financial and Torchmark shared seven directors including McCormick and Hagopian.[4] McCormick and Hagopian served as directors of W & R Financial and Torchmark from March 4, 1998 until they resigned from W & R Financial in May of 2000.

Before the spin-off and throughout 1999, W & R marketed, distributed and was principal underwriter for UILIC products—including life insurance policies and variable annuity contracts.[5] In 1999, W & R began evaluating proposals from other variable annuity providers, including Security Benefit Life Insurance Company ("Security Benefit"). In June of 1999, W & R informed UILIC that unless it paid additional compensation with respect to in-force annuities, W & R would move its relationship to a provider which would pay 25 basis points on new sales. On June 29, 1999, W & R advised UILIC that it would be making a decision on a new provider on June 30, 1999 and asked whether it would consider sharing a portion of so-called M & E charges on in-force annuities. UILIC refused to do so, and on July 1, 1999, W & R informed Security Benefit that it would accept its proposal, which included 25 basis points on in-force assets.

On July 2, 1999, Anthony McWhorter, the president and CEO of UILIC, telephoned Robert Hechler, the CEO of W & R, and asked that W & R delay any commitment to Security Benefit. Four days later, on July 6, 1999, McWhorter faxed Hechler a letter which proposed that UILIC pay an additional 15 basis points on in-force annuities. The letter stipulated that "[i]n return for this additional revenue, while we believe W & R is currently restricted with respect to replacing this business, we would expect to add specific language in the general agency agreement that restricted future replacement of [the existing block of variable annuity] business." Trial Exhibit 5. Absent such a stipulation, W & R could replace in-force

---

**3.** W & R Financial also alleges that at a board meeting on April 26, 2000, McCormick breached his fiduciary duty by failing to disclose to fellow directors that United Investors Life Insurance Company ("UILIC") or Torchmark might file suit against W & R Financial. *See id.* at 6. In its brief to the Court, W & R Financial has not asserted this claim or set forth any facts which support such a claim. *See Plaintiff Waddell & Reed Financial, Inc.'s Brief In Support Of Entry Of Judgment On Its Claim For Breach Of Fiduciary Duty* (Doc. # 512) filed September 14, 2004. In any event, McCormick's failure to communicate to the board of W & R Financial that UILIC or Torchmark might file suit was inadvertent. Moreover, because UILIC and Torchmark had already communicated to W & R Financial that litigation might be necessary, McCormick had no duty to repeat this fact to the board of W & R Financial.

**4.** After the spin-off, UILIC remained a subsidiary of Torchmark.

**5.** Beginning in 1990, UILIC compensated W & R under a principal underwriting agreement which could be terminated by either party on 60 days written notice. Trial Exhibit 47.

UILIC policies with those of other insurance companies such as Security Benefit.

On July 7, 1999, in response to McWhorter's letter of July 6, 1999, Hechler called McWhorter and proposed that UILIC pay 20 basis points on existing business. In a telephone call later that same day, Hechler and McWhorter reached a verbal agreement that W & R and UILIC would continue their relationship; that W & R would restrict its ability to replace UILIC annuities; that beginning January 1, 2000, UILIC would pay 20 basis points on in-force business; and that on contracts sold on or after that date, UILIC would pay 25 basis points. *See* Trial Tr. at 895–96. After July 8, 1999, W & R ceased all negotiations with Security Benefit.

On July 8, 1999, McWhorter sent the following letter to Hechler:

As you requested, this letter will set forth some details of the agreement that we reached over the telephone on Wednesday, July 7.

**Compensation payable to Waddell & Reed beginning 1/1/2000**

For variable annuity contracts issued beginning 1/1/2000:

7.75% of premiums received, plus

.25% annually of variable assets, paid monthly beginning the first month

For the in force block of variable annuity business (i.e. issues of 1999 and earlier):

.20 % annually of variable assets, paid monthly

**Certain variable annuity product features**

In addition to product features previously proposed, we agree to the following:

1.25% of mortality & expense charge

.15% admin. charge

7 year surrender charge period, with surrender charge pattern of 7%, 6, 5, 4, 3, 2, 1, 0%

$25 contract maintenance fee, waived for accounts [greater than] $25,000

By agreeing to the foregoing arrangements, we acknowledge that Waddell & Reed has withdrawn its consideration of possible relationships on attractive terms with other third party insurance companies in order to establish a long-term relationship with us. In doing so, Waddell & Reed has relied on our representations with respect to our commitment to provide, jointly with Waddell & Reed, a first-class, competitive product that is fully supported and serviced by sufficient resources, including personnel, systems and technology. We acknowledge that Waddell & Reed will commit substantial resources to market and provide a first-class, competitive product to its customers, and we agree that we will work cooperatively with Waddell & Reed and commit the reasonable resources necessary (a) to design, create, implement and introduce products and product features that will be first-class and competitive and (b) to enhance and improve such products and product features as the market for insurance products evolves. In addition, we acknowledge that the breadth and quality of client service is an integral component of providing a first-class, competitive product. Accordingly, we also agree to commit the reasonable resources necessary, including, but not limited to, personnel, systems and technology, to develop and/or acquire and implement the services necessary to support and service clients who purchase the products jointly offered by Waddell & Reed and us, and to enhance and improve such services in order to remain fully competitive.

Bob, I believe this fully describes the items that we discussed regarding compensation and product features. If you are in agreement with the foregoing

terms and conditions, please sign this letter below and return a copy to me as soon as possible.

Trial Exhibit 107. The letter expressly purported to set forth only "some details" of the verbal agreement of July 7, 1999. Hechler did not know what that reference meant, and he never asked for clarification of any other details. The issue was not important for him. *See* Trial Tr. at 481–82.

On July 14, 1999, W & R faxed a memo to Torchmark which included a draft press release announcing that the parties had "entered into an agreement." Trial Exhibit 93. C.B. Hudson, the CEO of Torchmark, forwarded the memo to the Torchmark directors, noting that the press release would be a topic of discussion at the Torchmark board meeting on July 22, 1999.

At a board meeting of W & R Financial on July 15, 1999, Hechler presented a summary of a "new fee arrangement" with UILIC. The board members received a copy of the letter dated July 8, 1999, a summary of the new annuity product features and a copy of the draft press release which announced the agreement with UILIC. *See* Trial Exhibit 7. Hechler described the new commission arrangement as "finalized." *See* 12/13/00 Richey Depo. at 166–68 (read at trial).

On July 20, 1999, W & R Financial issued a press release which announced the new compensation agreement. The press release stated as follows:

> [W & R] recently entered into an agreement with [UILIC] whereby commencing January 1, 2000, [W & R] will receive additional annual commissions from [UILIC] for selling variable products for which it is the underwriter. It is estimated that this arrangement will provide additional underwriting and distribution revenues of approximately $6.0 million in 2000.

Trial Exhibit 6 at 4.

The Torchmark board met on July 22, 1999. Its minutes reflect the following discussion concerning the agreement between W & R and UILIC:

> Chairman Hudson reported that he believes a tentative agreement to continue the variable annuity relationship between W & R and UILIC had been reached. While a formal written contract remains to be negotiated and executed, it is generally understood that W & R will continue to issue UILIC's variable annuities with UILIC paying W & R a commission of 7.75% of premiums received on variable annuity business written by W & R representatives issued on or after January 1, 2000. Additionally, UILIC will pay W & R monthly an asset management fee of .25% times the fund value on variable annuity business issued by UILIC for applications received from W & R on or after January 1, 2000. Mr. Hudson stated that UILIC had also tentatively agreed that it would pay W & R monthly incentive compensation of .20% times the fund value of all variable annuity business issued by UILIC for applications received from W & R prior to January 1, 2000. He emphasized that this incentive compensation will immediately terminate upon termination of the agreement and would be paid for generation of new variable annuity business, not to avoid replacement of existing business. He further noted that any written contract between the parties documenting this agreement must provide that W & R would not rewrite any insurance or variable annuity business to another company.

Trial Exhibit 94.

Two weeks after McWhorter's letter of July 8, 1999, on July 23, 1999, McWhorter

sent Hechler another letter which stated as follows:

> This follows my letter of July 8, 1999. As you know, the letter contained most of the details of the agreement we reached by telephone of Wednesday, July 7, 1999. My letter of general understanding needs to be formalized, however, into a specific amendment to the existing agreement between United Investors Life Insurance and Waddell & Reed, Inc. and also incorporate the oral agreement between Keith [Tucker] and C.B. [Hudson] reached on July 2, 1999. I have asked our Legal Department to provide me with the amendment sometime in August, and I will forward the same for review by you and your staff. I would like to meet with you following your review so that we may sign the amendment and discuss further the products, systems and services our companies are planning to offer as we move forward. Bob, I am looking forward to working with you and the other members of Waddell & Reed as we finalize our agreement and work together to offer the best possible products and services to our customers.

Trial Exhibit 33. Upon receipt, W & R and W & R Financial knew that this letter was inconsistent with any view that the letter of July 8, 1999 was a final agreement.

Over the next six months, from August of 1999 through January of 2000, the parties continued to negotiate and exchange proposed language to formally amend the principal underwriting agreement. On January 19, 2000, representatives of UILIC (including McWhorter) and W & R (including Hechler) conferred by telephone. During the conference call, Hechler claimed—for the first time—that the letter of July 8, 1999 was an enforceable stand-alone contract. He also announced that W & R would not restrict its ability to replace UILIC policies.

From July 8, 1999 through January of 2000, McCormick and Hagopian did not realize that UILIC and W & R had a material dispute regarding the enforceability of the letter of July 8, 1999. During this period, defendants believed that management of Torchmark, UILIC and W & R were engaged in discussions which would culminate in a formal agreement consistent with the letter of July 8, 1999. After the board meetings of W & R Financial and Torchmark in July of 1999, both defendants were unaware of any material dispute regarding the finality or enforceability of the letter of July 8, 1999. *See* 12/12/00 McCormick Depo. at 87 (read at trial); Trial Tr. at 878, 1025–26, 1031. When Hudson told the Torchmark board that the agreement was "tentative," *see* Trial Exhibit 94, McCormick and Hagopian understood him to mean that the agreement had to be formalized. Neither defendant intentionally withheld information that Torchmark did not view the letter as a final agreement. Their failure to disclose that information resulted from a good faith belief that management of W & R Financial and W & R knew Torchmark's view of the agreement and, moreover, that management was proceeding to finalize the agreement.

In Hechler's view, both defendants were candid; he did not know a single instance in which they were inattentive to their duties as directors of W & R Financial. Hechler considered both defendants to be honest and straightforward, and he had no reason to believe that they were less than impeccably honest. *See* Trial Tr. at 438–39. Furthermore, as the person most directly involved in negotiating the failed agreement between UILIC and W & R, Hechler did not know what defendants had to gain by not telling W & R Financial that

Torchmark did not view the letter of July 8, 1999 as a final agreement. *See id.* at 447.

### Conclusions Of Law

■ Because this is a diversity action, the Court applies Kansas choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "The generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to the fact and duration of corporate existence and the rights and liabilities of its officers, stockholders, and directors." *Consol. Beef Indus., Inc. v. Schuyler,* 239 Kan. 38, 40–41, 716 P.2d 544, 547 (1986). Because Torchmark and W & R Financial are Delaware corporations, the Court applies Delaware law. The parties agree that Delaware law applies to this claim. *See Pretrial Order* (Doc. # 390) at 3.

## I. Good Faith Error In Judgment By Director As To Obligation To Disclose Information Does Not Implicate Duty Of Loyalty

■ Article 8.1 of W & R Financial's Certificate of Incorporation, entitled "Elimination of Certain Liability of Directors," states as follows:

> A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any

breach of the director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) for paying a dividend or approving a stock repurchase in violation of Section 174 of the Delaware General Corporation Law, or (d) for any transaction from which the director derived an improper personal benefit.

Plaintiffs' Exhibit D10 (Doc. # 404) (effective as of March 3, 1998).[6] Here, W & R Financial alleges that McCormick and Hagopian breached their duties of loyalty. McCormick and Hagopian argue that they cannot be liable for breach of the duty of loyalty because they did not consciously decide to withhold information from the board of W & R Financial.

■ Individuals who hold dual or multiple directorships, as in the parent-subsidiary context, owe each corporation and each set of shareholders an "uncompromising duty of loyalty." *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del.1983). A director may breach his duty of loyalty by failing to disclose material information under circumstances in which full disclosure was obviously expected. *See Hollinger Int'l, Inc. v. Black,* 844 A.2d 1022, 1061 (Del.Ch.2004); *see also HMG/Courtland Props., Inc. v. Gray,* 749 A.2d 94, 121 (Del.Ch.1999) (concealment of facts from fellow board members implicates duty of loyalty); 1 *Principles of Corporate Governance: Analysis & Recommendations,*

---

**6.** Delaware law permits such provisions in order to protect directors from claims for breach of their duty of care. Del.Code Ann. tit. 8, § 102(b)(7). The statutory provision provides in part that corporate articles of incorporation may include:

> A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall

not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

Del.Code Ann. tit. 8, § 102(b)(7).

cmt. 6 § 5.02(a)(1) at 215 (director owes duty to avoid misleading corporation by misstatements and omissions and to affirmatively disclose material facts known to him). A good faith erroneous judgment as to the proper scope or content of the required disclosure, however, implicates only the duty of care and does not give rise to a separate claim for breach of the duty of loyalty. *Zirn v. VLI Corp.*, 681 A.2d 1050, 1062 (Del.1996); *see Hollinger*, 844 A.2d at 1062 (director breached duty of loyalty by intentionally subverting his role in process through course of conduct involving misleading and deceptive conduct toward fellow directors); *HMG*, 749 A.2d 94, 121 (Del.Ch.1999) (duty of loyalty implicated where conduct was not product of mere inadvertence, but conscious decision not to come clean with board); *see also Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 n. 35 (Del.1994) (no breach of duty of loyalty absent evidence that defendants deliberately violated disclosure obligations); *Oliver v. Boston Univ.*, 2000 WL 1091480, at *8 n. 25 (Del.Ch.2000) (duty of loyalty implicated where alleged misrepresentations and omissions are product of self-dealing, not good faith errors in judgment); *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 914–15 (Del.Ch. 1999) (claim for breach of fiduciary duty of disclosure implicates only duty of care when alleged violation was result of good faith, erroneous judgment about proper scope or content of required disclosure); *Solash v. Telex Corp.*, 1988 WL 3587, at *7 (Del.Ch. Jan. 19, 1988) (absent any adverse financial or personal interest such as entrenchment motivation or effect, directors' approval of transaction unquestionably implicates only duty of care); *In re Reliance Secs., Litig.*, 135 F.Supp.2d 480, 520 (D.Del.2001) (breach of duty of loyalty requires some form of self-dealing

or misuse of corporate office for personal gain).

If defendants breached any duty in this case, it was a duty of care and—most emphatically—not a breach of a duty of loyalty. As of July 22, 1999, McCormick and Hagopian knew that (1) W & R Financial had announced to board members that the compensation agreement was "finalized," and (2) Torchmark had announced to board members that the agreement was "tentative." Defendants' failure to relay Torchmark's view to W & R Financial was both inadvertent and completely understandable. After the board meetings in July of 1999, neither defendant was aware of any material dispute regarding the finality or enforceability of the letter of July 8, 1999. *See* 12/12/00 McCormick Depo. at 87 (read at trial); Trial Tr. at 878, 1025–26, 1031. When Hudson told the Torchmark board that the agreement was "tentative," *see* Trial Exhibit 94, defendants understood him to mean that the agreement had to be formalized. No credible evidence suggests that McCormick or Hagopian intentionally withheld information that Torchmark viewed the agreement as something less than final.

In sum, defendants in good faith believed that finalization of the agreement was a management issue—rather than a board issue—and that management of Torchmark, UILIC, W & R Financial and W & R had the matter well in hand and was in the process of negotiating and finalizing an agreement that was consistent with the letter of July 8, 1999. Defendants had no occasion to interject themselves into what they perceived to be a management problem that, in time, would be resolved. Accordingly, the Court finds that McCormick and Hagopian did not breach their fiduciary duty of loyalty to W & R Financial.[7]

---

7. The Court's finding is supported in part by the testimony of Hechler, who was the CEO of W & R and received the letter of July 8, 1999. Hechler testified that he thought both defendants were candid, that he did not know

## II. W & R Financial Already Knew Torchmark's View Of The Letter Of July 8, 1999

█ McCormick and Hagopian also had no duty to communicate Torchmark's view of the letter of July 8, 1999 because UILIC had already done so. A director does not have a fiduciary duty to disclose information where the complaining party already knows such information. *See Kahn v. Tremont Corp.*, 1996 WL 145452, at *17 (Del. Ch. Mar. 21, 1996) (no need to disclose general and commonly understood aspects of transaction), *rev'd on other grounds*, 694 A.2d 422 (Del.1997); *Golden Cycle, LLC v. Allan*, 1998 WL 276224, at *9–10 (Del.Ch. May 20, 1998) (no obligation to disclose to shareholders information already disclosed by corporation's public filings); *Scarabello v. Reichle*, 1995 WL 153338, at *2 (N.D.Ill. Apr. 6, 1995) (no fiduciary duty to disclose information that had already been disclosed); *Meyer v. Alco Health Servs. Corp.*, 1991 WL 5000, at *4 (Del.Ch. Jan. 17, 1991) (no duty to disclose facts that are known or reasonably available to stockholder); *Fisher v. United Techs. Corp.*, 1981 WL 7615, at *3, 6 Del. J. Corp. L. 380, 385 (Del. Ch. May 12, 1981) (no duty to disclose information to one who reasonably should be aware of it); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978) (party's reasonable belief that other party has access to facts should excuse him from new disclosures which reasonably appear to be repetitive).[8]

From early July of 1999, W & R Financial knew that Torchmark did not view the letter of July 8, 1999 as a final agreement. On July 7, 1999, Hechler orally agreed to a provision which restricted its ability to replace UILIC policies. W & R and W & R Financial knew that such a provision was part of the consideration for the compensation outlined in the letter of July 8, 1999. The letter of July 8, 1999 advised W & R and W & R Financial that it included only "some details" of the oral agreement of July 7, 1999. Trial Exhibit 107. Hechler did not know what that reference meant, and he never asked for clarification of any other details because the issue was not important for him. *See* Trial Tr. at 481–82. On July 23, 1999, UILIC specifically advised W & R that in addition to the terms outlined in the letter of July 8, 1999, other terms—including the terms of an oral agreement between Keith Tucker and C.B. Hudson—had to be included in the agreement. *See* Trial Exhibit 33. At trial, Tucker denied any oral agreement with Hudson; at the time, however, neither he nor anyone else at W & R ever bothered to find out what "agreement" had to be incorporated. The letter of July 23, 1999 told

---

of any instance where they were inattentive to their duties as directors of W & R Financial, that he considered both of them honest and straightforward and that he had no reason to believe that they were less than impeccably honest. *See* Trial Tr. at 438–39. Notably, Hechler did not attempt to qualify his answers by saying that based on the conduct alleged in this lawsuit, he must have misjudged them. Hechler further testified that he did not know what defendants had to gain by not telling W & R Financial that Torchmark did not view the letter of July 8, 1999 as a final agreement. *See id.* at 447. Likewise, the Court finds that defendants had nothing to gain by failing to disclose this information.

8. Very few cases address a director's fiduciary duty to disclose information to fellow board members, but such a duty is analogous to the duty owed to shareholders. At a minimum, a director should be excused from disclosing to fellow board members information which they already know. *Cf. In re Unisys Corp. Retiree Med. Ben. ERISA Litig.*, 57 F.3d 1255, 1262–63 (3d Cir.1995) (no fiduciary duty under ERISA to remind another of information already disclosed), *cert. denied*, 517 U.S. 1103, 116 S.Ct. 1316, 134 L.Ed.2d 469, 470 (1996); *Matter of Seidman*, 37 F.3d 911, 935–36 (3d Cir.1994) (no fiduciary duty of candor to remind loan committee of financial interest because committee already knew such information).

W & R Financial all it needed to know about Torchmark's view that the letter of July 8, 1999 was not a final agreement.[9] In sum, W & R Financial knew in early July of 1999 that without a provision which restricted its ability to replace UILIC policies, Torchmark did not view the letter of July 8, 1999 as a final agreement. For this additional reason, the Court finds in favor of McCormick and Hagopian on the claim of W & R Financial for breach of fiduciary duty.

**IT IS THEREFORE ORDERED** that W & R Financial take nothing on its claim against Harold T. McCormick and Louis T. Hagopian for breach of fiduciary duty. The Clerk is directed to enter Judgment consistent with this finding and the jury verdict entered on September 9, 2004.

---

9. Plaintiffs' insistence that it lacked such notice until November of 1999 or later is incredible. It can best be understood in light of a fundamental question which this case consistently calls to mind: why very intelligent people made the decisions which have led to such disastrous results for W & R Financial and W & R—beginning in July of 1999 and continuing to this time. This case represents one in a series of efforts to deflect from plaintiffs' management the responsibility for its decision-making process with regard to the letter of July 8, 1999. The Court does not necessarily believe that plaintiffs' management has consciously lied about its understanding of the letter of July 8, 1999 or otherwise acted in bad faith. On the other hand, even at the time of trial, plaintiffs' witnesses seemed to engage in collective denial of significant evidence that Torchmark directly told them that it did not view the letter of July 8, 1999 as a final agreement. If plaintiffs did not more consciously appreciate Torchmark's position, their blindness resulted from a complicated mixture of overconfidence, tunnel vision, collective rationalization, and deliberate inattention to troublesome or inconvenient information which challenged their view of the agreement and their rights or lack of rights thereunder. Notwithstanding their professions of ignorance, however, plaintiffs clearly had notice of all relevant information in July of 1999.